**In the Matter of the WELFARE OF K.P.C., G.F.C. and D.M.C., Children.**

No. C2–84–1465.

Court of Appeals of Minnesota.

April 30, 1985.

Jean E. Paulson, Walter S. Johnson, Cokato, for appellant.

Katy L. Stesniak, Asst. Wright County Atty., Frank Ramacciotti, Buffalo, Larry Dewight Crapser, Cedar Rapids, for respondent.

Heard, considered and decided by POPOVICH, C.J., and NIERENGARTEN and RANDALL, JJ.

## OPINION

RANDALL, Judge.

Following repeated reviews of an order which had adjudged these three children neglected, a petition to terminate parental rights was filed. After a hearing, the trial court ordered the rights of both parents terminated on the grounds that reasonable efforts had failed to correct the conditions leading to the determination of neglect and that the children were neglected and in foster care. The mother appealed, and we reverse as to her. As the father was not a party to this appeal, our decision does not affect his parental rights.

## FACTS

On the morning of September 27, 1982, the Wright County Sheriff's department and the county child protection unit each received a telephone call from concerned persons that these three children, ages 7 years, 4 years, and 18 months, were wandering around the trailer park in which they lived. The children were without shoes and stockings, and, despite cool autumn temperatures, only one child wore a jacket. Their mother was not at home. Investigation revealed that on the preceding day the children had been dropped off by their mother at the home of a neighbor. Their mother apparently became stranded that evening when her ride left without her, and could not get home to get her children. She reportedly tried to call her neighbor to explain, but received no an-

swer. The next morning the neighbor, who had often cared for the children, "reached the end of the line" and refused to let the children back into her home. The children wandered around the trailer park until they were taken into protective custody by a deputy sheriff and social worker.

On September 30, 1982, a petition was filed with the court alleging that the children were neglected. The basis for the neglect allegation was that the mother had placed the children in the care of babysitters inappropriate by reason of age or judgment, that on July 24 and September 27, 1982, the mother failed to timely return to resume care of the children after leaving them with babysitters, and that the two older children had been going to school without shoes or stockings. The neglect petition also alleged that the mother was incarcerated in the Sherburne County jail, was the subject of a Wright County arrest warrant, and that social workers believed both parents to be chemically dependent. The petition was later amended to delete the references to the incarceration of the mother and the arrest warrant, which were incorrect.

On October 5, 1982, a social worker with the county met with the mother to develop an out-of-home placement plan. During that meeting, the mother was served by the sheriff with a notice of foreclosure on her mobile home. The mother had no car and no money, and bad check charges were pending against her. The social worker noted that the mother seemed "dazed by the traumatic events of recent days, and somewhat relieved that the children are in foster care for she admitted she wouldn't know what to do with them at this point." The out-of-home placement plan developed at that meeting included the following provisions: the mother was to have a chemical dependency evaluation and follow recommendations, was to find suitable housing ("preferably low-income"), get a job and manage money, "explore various options ... for combining roles as caretaker of children and wage earner" including going on AFDC, finding a day job, or continuing with night job but finding a reliable, live-in babysitter, seek counseling, and comply with a visitation schedule allowing her to see the children Saturdays from 9:00 to 5:00.

On December 2, 1982, a hearing was held on the neglect petition. The mother did not appear, but her court-appointed counsel did. The court found that she had admitted the allegations of the petition, and adjudged the children neglected. The court directed the county to set up a plan and goals "for mother to have her children returned to her custody," and ordered a review hearing in six months.

Review hearings were held on March 8, May 26, and September 26, 1983. The mother attended each one with her attorney. At each hearing, she was ordered to comply with substantially the same plan—the plan initially drawn up with the social worker. The differences were that the chemical dependency evaluation, which was originally ordered to be in-patient, was changed to out-patient, and the visitation schedule was changed. After each hearing and again on October 5, 1983, the mother was warned that her failure to comply with the plan could result in the termination of her parental rights. On November 15, 1983, a petition for termination was filed.

Meanwhile, the children were in a foster home near Monticello. The mother visited the children every Saturday while she lived nearby, even though transportation was difficult for her. In December of 1982, however, she moved to the Twin City area to live with her mother. After that, her visits were sporadic, and became more and more infrequent. On September 6, 1983, visiting days were changed to Tuesdays, "because it was clear that the Saturday visiting schedule was not working." Between September 6, 1983 and the filing of the termination petition on November 15, 1983, the mother visited on four out of nine scheduled Tuesdays, and, although repeatedly asked to do so, the mother often failed to call the foster home when she was unable to come for a scheduled visit. The mother alleged that her failure to visit was caused by her inability to obtain transportation. The county alleges that the social

worker offered her rides whenever she wanted them.

The mother has been unable to find full-time work or part-time work on more than a casual basis. Because of her inability to find work, she has been unable to arrange a suitable place for herself and the children to live. She did participate in a chemical dependency evaluation, which resulted in a recommendation that she undergo treatment. When she arrived for her first session, however, the counselling center was closed and a sign indicated the center only had evening hours. She called her social worker to tell her of this. She did not show up for a subsequently scheduled appointment and did not schedule any more. At the hearing on September 6, 1983, the goal for chemical dependency counselling was modified to require only that she maintain herself chemically free. There is no evidence of further chemical abuse.

## ISSUE

Was there clear and convincing evidence supporting the trial court's decision to terminate the mother's parental rights under Minn.Stat. § 260.221(b)(5) and (7)?

## ANALYSIS

 In order to terminate parental rights, the court must find "clear and convincing evidence that one or more of the conditions set out in section 260.221 exist." Minn.Stat. § 260.241, subd. 1 (1982); *see In re Welfare of Rosenbloom*, 266 N.W.2d 888, 889 (Minn.1978); *In re Welfare of White Children*, 363 N.W.2d 79 (Minn.Ct. App.1985). The court must find clear and convincing evidence of the existence of a specific statutory ground for termination. *In re Welfare of Solomon*, 291 N.W.2d 364, 367 (Minn.1980). There is a preference for the child's natural parent and "whenever possible the family relationship should be strengthened and preserved." *In re Welfare of Barron*, 268 Minn. 48, 53, 127 N.W.2d 702, 706 (1964).

The supreme court has cautioned, and we have reiterated, that "[m]ere poverty ... of the parents is seldom, if ever, a sufficient ground for depriving them of the natural right to the custody of their child or chil-dren, to say nothing of the statutory right." *In re Dependency of Klugman*, 256 Minn. 113, 120, 97 N.W.2d 425, 430 (1959) (quoted in *Welfare of White*, 363 N.W.2d at 80). Many of the problems which led to the initial determination of dependency—the lack of a reliable babysitter, for example—as well as the problems which supported the decision to terminate the mother's parental rights, were directly related to the mother's poverty. She had no car, and thus visiting the children was difficult. There is evidence in the record of a strained relationship between the social worker and the mother that could have led the mother to turn down rides offered to her. She had no job, and thus setting up a home for the children was difficult. The county argues that she should have applied for AFDC and low-income housing, but adds that she could not qualify for either until her children were returned to her. Had the county supplied concrete help to the mother in finding a home, getting financial assistance, and getting a job, the family's restoration would have been more likely.

Further, the conditions that led to the determination of neglect were not so egregious as to warrant a termination of the mother's rights without her having a realistic opportunity to change her life. While the mother had difficulty finding adequate babysitting assistance, it must be remembered that it was the babysitter, without the mother's knowledge, who locked the children out of the house the morning they were taken into protective custody. With help from the county, the mother could have found reliable persons to care for her children when she could not be there. Previous contacts between the mother and social service agencies had led to findings that the mother was an adequate parent and, while she needed assistance in caring for the children, the evidence indicates she cared for them and tried to provide for them as best she could. There were no allegations of abuse of any kind.

 The county makes much of the fact that the mother never got help for her

chemical dependency. There is no indication in the record that her drinking interfered with the parent/child relationships. The mother's immediate problems were having no place to keep the children and no reliable babysitter to leave them with. Had she had a secure home and a reliable babysitter, the children would not have been adjudged neglected. Thus, forcing her to undergo chemical dependency treatment before allowing her to get her children back, although admittedly an important and legitimate concern, should not be the sole determinative factor, since it was not solely her chemical dependency which led to the neglect of the children and since there is no evidence of continued substance abuse.

■ The main reason behind the trial court's termination decision seemed to be the court's concern over the mother's failure to exercise her visitation rights, and her apparent unconcern over whether she got her children back or not. She seemed always to be able to make it between the Monticello-Elk River area and the Twin Cities for recreation, but not for visitation or counselling. It is interesting to note that right after the children were taken from her, the mother visited them regularly and often. The longer they stayed away, however, the less she saw them. It seems almost as though the system in this case defeated its purpose; that is, rather than increase the mother's determination to reunite her family, the increasing court involvement made her increasingly pessimistic about the possibility of reuniting her family. It does not seem surprising that she should feel helpless in the face of the odds against her.

While we realize the children need stability and permanence in their lives and that this should, for their sakes, be resolved as quickly as possible, we do not find clear and convincing evidence to support this termination. With substantial and concrete help from county authorities, this mother should be able to reunite her family and provide them with a secure home.

## DECISION

The record does not contain clear and convincing evidence supporting the termination of the mother's parental rights. This matter is reversed and remanded to the county court with instructions to:

(1) Supervise the preparation of a new and realistic out-of-home placement plan;

(2) Permit the mother to have a reasonable period of time of at least one year to comply with the terms of the new plan;

(3) Assist the mother with regular visitation;

(4) Provide appropriate help in obtaining housing and financial assistance as well as parenting assistance, if needed.

Reversed and remanded.