**In the Matter of the WELFARE OF J.A., a minor.**

**No. C1–85–592.**

Court of Appeals of Minnesota.

Nov. 19, 1985.

Review Denied Jan. 23, 1986.

James L. Berg, St. Louis Park, for appellant.

Marcia Rowland, Carver County Atty., Virginia Palmer, Asst. County Atty., Chaska, for respondent.

Nancy Platto, Chaska, Guardian Ad Litem.

Heard, considered and decided by LANSING, P.J., and RANDALL and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

D.A. appeals the trial court's termination of her parental rights to her son, J.A., pursuant to Minn.Stat. § 260.221(b)(5) and (b)(7), following an adjudication of dependency and neglect. We affirm.

## FACTS

D.A. was referred to Carver County Community Social Services prior to J.A.'s birth. While pregnant with J.A., D.A. attempted suicide and otherwise threatened to harm herself if she did not get medication she wanted for her migraine headaches. D.A. has a history of migraines, as well as depression, emotional problems, chemical abuse, and alcohol abuse. D.A. has been on general assistance throughout the course of these proceedings.

Following J.A.'s birth February 27, 1982, J.A. spent several weeks in the hospital because he was born prematurely and was underweight. While he was in the hospital, D.A. attempted to forcibly remove him.

On April 24, 1982, J.A. was admitted to St. Francis Hospital for observation of bruises on the right side of his head. The hospital staff observed additional older bruises on other parts of J.A.'s body and suspected child abuse. On April 24, 1982, D.A. called her doctor and told him she had a severe migraine headache and wanted to die.

That evening D.A. attempted to forcibly remove J.A. from the hospital. At the time she was under the influence of barbituates, and she assaulted a nurse. J.A. was placed in a foster home after his release from the hospital. D.A. was placed on a medical hold until August 29, 1982, when she appeared in court for DWI sentencing.

On June 9, 1983, D.A.'s probation officer informed Community Social Services that D.A. had threatened to kill herself and J.A. She repeated the threat to her attorney who reported it to the sheriff.

In October 1982, the trial court determined J.A. was neglected. The court transferred legal custody to Carver County for foster care, ordered psychological and chemical assessments of D.A., and ordered D.A. to meet with social services to prepare a treatment plan.

D.A. twice attempted to remove J.A. from his foster home during supervised visitations. The second attempt culminated in a high-speed car chase.

In November 1982, D.A. threatened her social worker, and a new worker was assigned to work with her.

The court-ordered meeting between D.A. and social services to set up D.A.'s treatment plan took place January 14, 1983, after D.A.'s psychological evaluation was complete. In addition to social service personnel, Dr. Boutin, a court appointed psychiatrist, and Dr. Campbell, a licensed consulting psychologist chosen by D.A.'s attorney, were present.

The group devised a plan that included outpatient therapy, group therapy, and chemical dependency evaluation and treatment. The plan also called for supervised visitation with J.A. with the provisions that D.A. neither attempt to remove J.A. from his foster home nor engage in abusive or threatening behavior during visitation. The plan required D.A. to remain law abiding and abstain from the use of chemicals and provided that if D.A. should fail to comply, she would enter long-term treatment at Willmar State Hospital. The plan required D.A.'s signature as her commitment to abide by its terms.

D.A. initially refused to sign the plan, but she eventually signed it after the county attorney moved for court-ordered compliance. At this point D.A.'s court-appointed attorney withdrew because of D.A.'s verbal abuse. Her new attorney represented her when she signed an agreement that the plan would go into effect August 31, 1983, and be reviewed November 30, 1983. The plan was incorporated into a trial court order, including the requirement, conditioned upon D.A.'s "compliance with each and every term" of the plan, that D.A. "be admitted to and complete long-term inpatient treatment at a facility such as Will-

mar State Hospital as a condition of J.A.'s return to her custody."

Due to medical problems, as well as a lack of money to buy gas for her car, D.A. had trouble getting to her therapy sessions with Dr. Campbell. Her attendance at therapy sessions was sporadic, and eventually Dr. Campbell refused to see her.

D.A.'s visitation with J.A. was also sporadic. The county claims she canceled over half her visits during December 1983, and January 1984. In February 1984, social services terminated D.A.'s visitation with J.A.

The court, on January 30, 1984, found D.A. had failed to comply with the plan for treatment contacts and visitation and ordered her to enter Willmar State Hospital for long term inpatient treatment. D.A. refused to enter Willmar State Hospital. She offered to enter an inpatient chemical dependency treatment program in Carver County, but the court did not accept her offer as compliance with the treatment plan.

On April 10, 1984, social services filed a petition to terminate D.A.'s parental rights. The matter was heard on November 1. Dr. Boutin, the court appointed psychiatrist, testified that D.A. suffers from a character disorder resistant to change. She further testified that D.A.'s impulsiveness, poor judgment, and antisocial behavior would put J.A. at risk. She stated that D.A.'s prognosis, even with long term treatment, was poor. Dr. Campbell testified that without D.A.'s cooperation, other treatment programs would be ineffective. Both Drs. Boutin and Campbell recommended termination of D.A.'s parental rights.

The court refused to admit D.A.'s testimony as to why she had been unable to keep her appointments with Dr. Campbell and about her visitation with J.A. The court sustained the guardian ad litem's objections based on relevancy, agreeing that once J.A. had been determined dependent and neglected and in foster care, and once D.A. had signed a treatment plan and missed required treatment and visitation contacts, evidence relating to visitation

with J.A. and D.A.'s attempts to comply with the treatment plan was irrelevant.

The trial court terminated D.A.'s parental rights under Minn.Stat. § 260.221(b)(5) and (b)(7). The fifth of seven statutory grounds for termination deals with uncorrected circumstances of neglect:

That following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination * * *

Minn.Stat. § 260.221(b)(5) (1984). Subsection (b)(7) permits termination if a child is neglected and in foster care, a concept defined as follows:

"Neglected and in foster care" means a child

(a) Who has been placed in foster care by court order; and

(b) Whose parents' circumstances, condition, or conduct are such that the child cannot be returned to them; and

(c) Whose parents, despite the availability of needed rehabilitative services, have failed to make reasonable efforts to adjust their circumstances, condition or conduct, or have willfully failed to meet reasonable expectations with regard to visiting the child or providing financial support for the child.

Minn.Stat. § 260.015, subd. 18.

The court found that D.A. had made no significant attempts to comply with the treatment plan, that chances were poor for correcting conditions of neglect in the future, and that the child could not be returned to the circumstances of her parent.

At the November hearing, D.A. informed the court that she was three and one-half months pregnant. She testified of her willingness to enter Lincoln House, a program that teaches parenting skills. She expressed her willingness to undergo outpatient therapy. She said she had refused to enter Willmar as an inpatient because Willmar would not improve her parenting skills. She testified that she had stopped using chemicals and was involved in a treatment program. She also testified that

she was not using biofeedback rather than prescription drugs to control migraine headache pain. At the conclusion of the November trial, the court announced its decision for termination, but said that D.A. would have a further chance before the order issued to present any clearly persuasive plans that might change the court's mind. The court issued its order in December, but stayed it until February 1, 1985, so that D.A. would have adequate time to present a plea for other action.

On January 31, 1985, D.A. filed an affidavit with the court stating that she was enrolled in an outpatient chemical dependency treatment program and had completed five weeks of the program. She stated that, as part of the program, she was attending A.A. once a week and would participate in a twelve week aftercare program. She was also seeing a clinical psychologist once a week and was planning to begin participation in the Lincoln House program, which teaches parenting skills. She was also attempting to obtain a job so she would no longer be dependent upon general assistance.

On February 4, 1985, the trial court issued an order terminating D.A.'s parental rights. In an accompanying memorandum, the court said that D.A. had not demonstrated to the court's satisfaction that the parental relationship should continue. The court further stated:

> As noted in the court's Memorandum attached to the Findings of November 1, 1984, the court's stay would provide the mother with time to attempt to amend the Findings, but the court further cautioned the mother that it will necessitate the highest kind of proof because of the history of the case to persuade the court to a different result. While the court has stated its policy in the past, that (it) is slow to terminate, under all of the attendant circumstances and the evidence that is before the court, the court is left with no other recourse but to consider the paramount welfare of the child and allow for the termination to proceed.

## ISSUES

1. Was the trial court's termination of D.A.'s rights supported by clear and convincing evidence?

2. Did the trial court err in excluding D.A.'s testimony on her care of J.A., the circumstances leading up to the neglect proceeding, and D.A.'s efforts to comply with the treatment plan?

## ANALYSIS

### I.

The standards for review of orders for determination of parental rights are stringent, so our scope of review is broad. *In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn.1980) (citations omitted). While "some deference" is to be given to trial court findings for termination, the Minnesota appellate courts will "closely inquire" into the sufficiency of the evidence supporting the findings and will exercise "great caution" in termination proceedings. *In re Welfare of Clausen*, 289 N.W.2d 153, 156 (Minn.1980) (citations omitted).

We must keep in mind upon review that the grounds for termination must be supported by clear and convincing evidence. *In re Welfare of Rosenbloom*, 266 N.W.2d 888, 889, (Minn.1978). Unless the evidence "clearly mandates" termination, the action cannot be taken. *In re Welfare of Solomon*, 291 N.W.2d 364, 367 (Minn. 1980) (citations omitted). Similarly, the law presumes the fitness of the parent. *In re Dependency of Klugman*, 256 Minn. 113, 118, 97 N.W.2d 425, 428–29 (1959). The relationship of the parent and child must be preserved "whenever possible." *In re Welfare of Barron*, 268 Minn. 48, 53, 127 N.W.2d 702, 706 (1964); Minn.Stat. § 260.011, subd. 2 (1984).

Generally, the cause for termination of parental rights must be "grave and weighty." *In re Welfare of H.G.B.*, 306 N.W.2d 821, 825 (Minn.1981) (citation omitted). In addition, there must be an appropriate level of proof of one of the seven grounds for involuntary termination identified in Minn.Stat. § 260.221(b). *In re Wel-*

*fare of P.J.K.,* 369 N.W.2d 286, 290 (Minn. 1985).

■ Upon examination of the record and the trial court's findings, we conclude there are adequate grounds to terminate the mother's rights. The cause is grave and weighty.

The trial court found that the child's mother, despite reasonable social service efforts, had failed to correct conditions of neglect. *See* Minn.Stat. § 260.221(b)(5). The same findings on efforts and response bear on the statutory concept of neglected and in foster care. *See* Minn.Stat. § 260.-221(b)(7); § 260.015, subd. 18(c); § 260.155, subd. 7(2), (3), (4), (5), and (7). The court found that the prognosis for correcting the conditions of neglect was poor, enhancing the overall finding of neglected and in foster care. *See id.* § 260.155, subd. 7(6). The court also found, rounding out its consideration of standards on neglected and in foster care, that the ongoing conditions of neglect were such that the child could not be returned to the home of the mother. *See* Minn.Stat. § 260.015, subd. 18(b). The child has been in foster care almost continuously since his birth.

These critical findings of fact by the trial court were supported by numerous particular findings, and the findings are supported by the evidence. The child was first found in dangerous circumstances. Numerous treatment plans have been attempted and none have been of significant benefit for D.A. A comprehensive formal treatment plan was utilized to seek help for her. Competent medical evidence indicates that the mother's course of conduct, dangerous to her child and to herself, involves a character disorder that cannot be remedied through any treatment plans known to be available.

As the trial court's consideration of the case reached its final stage, D.A. produced evidence of outpatient treatment efforts and her willingness to participate in a residential program for parents and children. Her current participation in therapy efforts is a positive sign, one that contradicts the observations of the trial court regarding the permanence of D.A.'s condition. It

would be a mistake, however, to substitute our judgment for that of the trial court on conflicting evidence of this kind. The trial judge was in the best position to measure whether current involvement in treatment approaches significantly altered the prognosis for D.A. that had been otherwise proven. The trial court deliberately considered this evidence but found inescapable the clarity and the weight of other evidence it had heard. We have carefully scrutinized this decision and we cannot say it was erroneous.

Appellant disputes whether she was given sufficient help to improve her circumstances. She had difficulties with social workers, and treatment services were withdrawn when her participation was inadequate. These are matters of great concern to us. The legislature had made it clear that there must be a careful measuring to determine whether services are adequate, appropriate, and reasonable. *See* Minn. Stat. § 260.155, subd. 7(5), § 260.221(b)(5).

To measure the adequacy of services, it is necessary to learn whether the services go beyond mere matters of form, such as the scheduling of appointments, so as to include real, genuine help to see that all things are done that might conceivably improve the circumstances of the parent and the relationship of the parent with the child. *See In re Welfare of White,* 363 N.W.2d 79, 80–81 (Minn.Ct.App.1985). Here again, the trial court considered the question and made numerous findings that social service efforts were extensive and reasonable. It would have been helpful if there had been more specific findings stating whether services were genuinely developed to assist D.A. and whether such services were futile. On the whole, it is clear that the trial court was satisfied with the services and that the evidence sustains the trial court's findings such that we cannot say they are erroneous.

II.

■ D.A. contends the trial court erroneously refused to admit evidence on her visitation of J.A. and her efforts to participate in outpatient counseling programs. The court viewed much of this evidence as

irrelevant, and the court would not permit its presentation. The court apparently dwelled on evidence that further outpatient care would be futile; the court thus concluded that it was no longer necessary to explore the details of occasions in the past when treatment appointments or visitation contacts were scheduled but did not occur. We cannot agree that this evidence was irrelevant, because it is of a kind that would be helpful to measure the reasonableness of services offered and the kind of response given by D.A. *See* Minn.Stat. § 260.155, subd. 7; Minn.R.Evid. 401. Limitations on the representation of this evidence, however, did not harmfully encumber the process of finding facts on the condition of D.A. and the future prospects for helping her. We conclude that the court did not commit reversible error in excluding this evidence.

## DECISION

The termination of appellant's parental rights was supported by adequate evidence. There was no reversible error in the limits placed on the presentation of evidence regarding fruitless arrangements in the past to assist appellant.