In re WELFARE OF M.J.L.

Nos. C2–87–315, C6–87–382.

Court of Appeals of Minnesota.

June 16, 1987.

John D. Undem, David C. Johnson, Ronald P. Bowman, International Falls, for M.J.L.

Considered and decided by POPOVICH, C.J., and WOZNIAK, and LESLIE, JJ., with oral argument waived.

## OPINION

LESLIE, Judge.

Appellants Gale Wetherbee, mother, and M.J.L., child, appeal from an order terminating appellant Wetherbee's parental rights with regard to M.J.L. M.J.L. joins in this appeal because, despite indicating he wanted to be adopted by Gale's former sister-in-law and husband, he has also indicated that he wants his mother to be able to visit him.

## FACTS

Appellant Gale Wetherbee was 17 years old when M.J.L. was born in 1978. M.J.L.'s biological father had left previously when he discovered Gale was pregnant. Gale was living with her mother, Barbara Erickson, in Margie, Minnesota at M.J.L.'s birth. Two years after M.J.L.'s birth Gale moved with her son to Big Falls, Minnesota into low rent housing. She returned to her mother's home after a few months, as she was unable to afford the rent on her own. Later in 1980 Gale moved back to Big Falls with M.J.L. to live with Steve Antin, a man she soon married. After about seven months Gale and M.J.L. again returned to her mother's home, this time with Steve Antin. In 1981 Gale divorced Antin and moved with M.J.L. back to Big Falls where she moved in with Jerry Wetherbee, another man she later married. During this whole period, from 1978 until 1982, Gale received extensive help in caring for M.J.L. from her mother and from Darlene and Jerry Carlson. Darlene Carlson was Gale's former sister-in-law.

In January of 1982 Gale and Jerry Wetherbee moved with M.J.L. to Eagan, Minnesota. In the Fall of 1982 Gale began traveling over the road in a truck with Jerry Wetherbee. M.J.L. became "too much" for Jerry so Gale called Darlene and Jerry Carlson and asked them to pick M.J.L. up. They drove down to get M.J.L., who has resided with the Carlsons on a full time basis since then. From 1982 to 1984 Gale traveled over the road visiting M.J.L. every three or four months. In July of 1984 Gale moved to Grand Island, Nebraska. She worked as a waitress while her husband continued to drive a truck. In October of 1984 Gale returned to Minnesota to bring M.J.L. to live with her. The Carlsons did not allow Gale to remove M.J.L., feeling it would not be in the child's best interests. For that reason Darlene Carlson asked the assistance of Koochiching Family Services in petitioning for a dependency hearing.

The petition was filed and a hearing held in October of 1984. The petition was continued pending the outcome of a child foster care plan. The plan placed M.J.L. in the Carlson home with the ultimate goal of reunification with M.J.L.'s mother Gale. Gale was assigned specific actions to be taken to achieve this goal:

1. [C]ontact Nebraska South Central District of Social Services to discuss resources available for parenting skills [and] report to Koochiching Family Services the resources available and whether or not she plans to participate in any of their resources.

2. [C]ontact Bill Cowan of Grand Island, Nebraska to discuss Parents Anonymous to see what resources may be available in the Grand Island area and report back to Koochiching Family Services as to whether or not she plans to participate in these resources.

3. [C]ontact Koochiching Family Services and inform them of their address in Grand Island. About the middle of November 1984 * * * advise them of her current situation to include: housing, employment, contacts with [M.J.L.], contacts with resources in Grand Island [and] report of how she views her participation in the resource of her choice.

4. [C]onsent to the release of psychological assessments and other pertinent evaluations to Koochiching Family Services.

5. [C]ontact * * * appropriate school officials at Grand Island, Nebraska prior to her reunification with [M.J.L.] and provide whatever assistance is required in transferring school records and assisting [M.J.L.] in adapting to his new school environment and neighborhood.

6. [Maintain] weekly contact with [M.J.L.] either by phone, letter or personal visit whichever is most convenient and economically feasible.

The plan also provided that "Koochiching Family Services will assist in the reunification procedure wherever possible," but that services to Gale will have to be provided in the Grand Island, Nebraska area.

Dave Mills, a social worker for Koochiching Family Services, was assigned to the

case and testified as to Gale's compliance with the plan at the termination hearing. During cross-examination Mills confirmed that Gale was not required to act on the fifth requirement, as reunification had not yet been contemplated, but that Gale was responsible for requirements one through four and six. Mills testified as to Gale's specific actions made to comply with requirements one through four. When asked whether these amounted to substantial compliance of all the requirements Mills replied, "Gale did follow some of their requirements, yes." When asked whether Gale had followed four out of the six he replied, "[T]hat could be." Regardless, Gale clearly did not comply with requirement six. While she was required to maintain weekly contact with M.J.L., she only contacted him once a month during the period the plan was implemented, October 16, 1984 to April 25, 1986.

On April 25, 1986 there was a review hearing of the foster care plan. Gale was notified of the hearing and appeared by telephone. The placement was reviewed. It was determined that Gale had contacted the Department of Social Services in Nebraska and requested a home study advising the department of her address. Yet, it was found that Koochiching Family Services had had trouble locating Gale at times. Gale had also released psychological data and contacted Nebraska school personnel. A new plan was formulated which basically required Gale to:

1. [A]s she is now separated from her husband [she is to] keep Koochiching Family Services advised of her marital status.

2. [P]articipate in a program that will assist her in developing parenting skills necessary in caring for [M.J.L.].

3. [C]onsider the possibility of individual therapy.

4. [C]onsent to the release of psychological assessments or other pertinent psychological information.

5. [H]ave weekly contact with [M.J.L.].

6. [K]eep Koochiching Family Services advised of her current situation.

On May 28, 1985, within thirty-three days of the hearing and formulated plan, Koochiching Family Services requested a hearing on the continued dependency petition. M.J.L. was found dependent on July 15, 1985. The second foster care plan was still in effect at that time.

Gale later testified that from April 25, 1985 to January 1986 she substantially complied with the April 25 plan. This testimony was neither corroborated nor directly disputed. In January 1986 the Carlsons moved with M.J.L. to Big Falls, Minnesota and Jane Barthell replaced Dave Mills as social worker on the case. In that month another review hearing was held with Gale present. Jane Barthell later testified at the termination hearing that at that time she went over Gale's inadequacy as far as implementation of the plan had gone with her at this review hearing. When asked what conditions Gale was asked to conform to, Barthell stated Gale was told she had to keep family services informed of her whereabouts and marriage situation, continue her recent participation with a counselor at the Nebraska Community Mental Health Center, fill out a release of information allowing that counselor to report to social services, continue her recent involvement in the parenting program, send a description of that program to social services and have weekly contacts with M.J.L.

Barthell further testified that after the January hearing until a new review hearing was scheduled in June of 1986 Koochiching Family Services did not have any contact with Gale. Because virtually no action had been taken on Gale's part from January until June, the June 15, 1986 hearing and review resulted in a determination that it was no longer appropriate to work with Gale on reunification. A petition for termination of parental rights was filed. Gale did not attend the June 15, 1986 hearing and later claimed she did not have notice of it. Barthell indicated notice of the hearing had been sent. Barthell also testified that although Gale had problems of irresponsibility and immaturity, which

led to the petition for termination of parental rights, she did not appear to have any chemical or criminal problems.

In June of 1986 Gale returned to Minnesota after terminating her relationship with Jerry Wetherbee. She increased her contact with M.J.L. by seeing him in person on two occasions, but moved to Grand Rapids and then Brooklyn Park in search of waitress work. At the time of the termination hearing she had formulated a desire to move with M.J.L. to International Falls once she and he had reunited.

Pursuant to hearings held on October 31 and November 18 of 1986, and a November 21 interview with M.J.L. in chambers, Gale Wetherbee's parental rights were terminated. The trial court found M.J.L. was dependent and in foster care and that Gale had not complied with any of the established plans for unification. Additionally, when interviewed in chambers M.J.L. had indicated he wanted to be adopted by Darlene and Jerry Carlson saying, "I can't wait to be a Carlson." The court ultimately found:

7. That the child has spent about two-thirds of his life in the care of Darlene Carlson and Jerry Carlson and during this time Gale Wetherbee has not contributed to the child's support, very seldom visited the child, usually sent no birthday presents or Christmas presents and did not participate in planning for the child;

8. That Gale Wetherbee's life style is extremely unstable and she has failed to make corrections in her living arrangements that she needs to make to properly care for her child;

9. Koochiching County Social Services has attempted to reunite mother and child and has formulated plans to accomplish this end. Gale Wetherbee has not completed any of the plans and conditions and because of her emotional and mental instability will never be able to adjust her circumstances, conditions and conduct to meet the terms and conditions imposed by Family Services with regard

to caring, visiting and providing financial support for the child;

10. That the terms, conditions and expectations imposed by Koochiching County Family Services have been reasonable and their purpose was to reunite the mother and child;

11. That Gale Wetherbee's current circumstances, conduct and home condition are such that the child cannot be returned to her and her failure to correct her circumstances, conduct and home conditions was a willful failure.

The court therefore concludes that the circumstances, conditions and conduct of Gale Wetherbee are such that the child cannot be returned to her despite the availability of needed rehabilitative services, she has failed to make reasonable efforts to adjust her circumstances, conditions and conduct and has willfully failed to meet reasonable expectations with regard to visiting, providing financial support for the child and caring for the child.

The court further concludes that Gale Wetherbee will never correct the circumstances, conditions and conduct necessary to have the child returned to her and the court determines further that it is in the best interests of the child that Gale Wetherbee's parental rights be, and hereby are, terminated.

## ISSUE

Was there clear and convincing evidence supporting the trial court's decision to terminate the mother's parental rights under Minn.Stat. § 260.221(b)(5) and (7)?

## ANALYSIS

■ This court's scope of review for an order terminating parental rights is broad, as the standards for review of such an order are stringent. *In re Welfare of J.A.*, 377 N.W.2d 69, 72 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Jan. 23, 1986). "While 'some deference' is to be given to trial court findings for termination, the

Minnesota appellate courts will 'closely inquire' into the sufficiency of the evidence supporting the findings and will exercise 'great caution' in termination proceedings" *Id.* (quoting *In re Welfare of Clausen*, 289 N.W.2d 153, 156 (Minn.1980)).

The law presumes the fitness of the parent. *Id.* (citing *In re Dependency of Klugman*, 256 Minn. 113, 118, 97 N.W.2d 425, 428–29 (1959)). This preference for the child's biological parent requires that "whenever possible the family relationship should be strengthened and preserved." *In re Welfare of Barron*, 268 Minn. 48, 53, 127 N.W.2d 702, 706 (1964). Parental rights may not be terminated unless the party seeking the termination can show clear and convincing evidence that a specific statutory ground for termination exists. *In re Petition of M.G.*, 375 N.W.2d 588, 590 (Minn.Ct.App.1985).

Gale Wetherbee's parental rights were terminated pursuant to Minn.Stat. §§ 260.-221(b)(5) and (7) (1986). That statute provides:

> The juvenile court may, upon petition, terminate all rights of a parent to a child in the following cases:
>
> \* \* \* \* \* \*
>
> (b) If it finds that one or more of the following conditions exist:
>
> \* \* \* \* \* \*
>
> (5) That following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination; or
>
> \* \* \* \* \* \*
>
> (7) That the child is neglected and in foster care.

The trial court found that reasonable efforts had been made toward unification of mother and child, but that they had failed. The trial court stated in its memorandum:

> The court's decision is based upon the mother's total lack of care over an extended period of time of this child. The

lack of care, contact and support is an abandonment in this court's opinion.

> The child is placed with people that Gale Wetherbee knows and she has had the opportunity, whenever she wished, to visit with the child, to confer with the foster parents, to meet the reasonable conditions set down by Koochiching County Social Services and to care for her child. Her own mother appeared and testified that Gale was not truthful and was of the opinion the child would be much better off with Darlene and Jerry Carlson.

> Currently Gale is not employed, is living in the parental home of a male friend who is also living there. She has no plans other than vague references to finding work but would have us believe that she has every intention of settling down and making a home for her son. The court plainly doesn't believe her.

> During the summer of 1986 she was working in Grand Rapids and would have had every opportunity to visit extensively with her son and attempt to arrange a home for him. Her visits were minimal and on impulse she quit her job, unbeknownst to anyone else and moved to Minneapolis with her friend, Harvey Winger. This failure is determinative, in the court's mind, that Ms. Wetherbee can never correct her actions or life style and as such could never be an adequate parent.

> The foster placement in the home of the Carlsons is definitely in the child's best interests. In that home the child will continue to see his maternal grandmother and relatives. Darlene Carlson was married to the child's maternal uncle and her child would be a cousin of [M.J. L.'s]. In the Carlson home [M.J.L.] has found a stable and loving home life by people who truly care about him in a situation where he visits back and forth. The Carlsons are excellent parents and it would certainly be in this child's best interests to have his parental rights terminated with his natural mother and be

adopted by the Carlsons. [M.J.L.] expressed this wish in chambers, in speaking with the judge, on October 31, 1986.

■ Since the determination of M.J. L.'s dependency is not challenged, the question here is whether reasonable efforts at unification have been made and have failed. The child's best interests *alone* do not provide an independent basis for termination of parental rights. *In re Petition of M.G.*, 375 N.W.2d 588, 591 (Minn.Ct.App.1985); *see In re Welfare of J.J.B.*, 390 N.W.2d 274, 279 (Minn.1986) (best interests of both child and parent must be balanced in a termination decision). In M.J.L.'s case the trial court was correct in finding the existence of clear and convincing evidence supporting the conclusion that reasonable efforts at unification have been made and have failed.

■ Appellant Gale Wetherbee claims she substantially complied with the plans formulated by Koochiching Family Services and thus clear and convincing evidence of failure does not exist. Appellant claims that if anyone has failed it is Koochiching Family Services for failing to offer appellant more assistance. Certainly, such services must go beyond mere form and be adequate, appropriate and reasonable. *In re Welfare of J.A.*, 377 N.W.2d at 73.

Yet, we find that Koochiching Family Services has provided appellant with adequate, appropriate and reasonable services. Appropriate plans for reunification were formulated. Caseworkers were assigned. Appellant was never denied requested aid. In fact, appellant maintained very little contact at all with Koochiching Family Services. It is her lack of effort at implementation of the formulated plans and lack of contact with the service that led to the petition for termination of parental rights.

Appellant claims substantial compliance with the reunification plans, yet the key ingredients of the plans, weekly contact with M.J.L. and efforts to establish parenting skills, were never complied with. Unlike the mother in *In re Welfare of K.P.C.*, 366 N.W.2d 711 (Minn.Ct.App.1985), cited by appellant, who was faced with substantial financial barriers in her efforts to see her children, appellant could have visited her children at will or maintained telephone contact. *See id.* at 714. In fact, the Carlsons allowed appellant to stay in their home with M.J.L. when she chose. Appellant did not at any time over the nearly two year period of the unification plan's operation maintain the required contact with M.J.L. as specified. During much of this time appellant lived in Nebraska. When she returned to Minnesota she had the opportunity for extensive visits with her son. She did not use this opportunity and in fact soon moved away from her son again to another city.

Appellant's efforts at establishing necessary parenting skills are similarly token. The weight of evidence establishing economic barriers to achievement of this goal and the adverse relationship with assigned social workers present in *In re Welfare of K.P.C.* are not present here. *See In re Welfare of K.P.C.*, 366 N.W.2d at 714. Appellant has done nothing to rectify her deficiencies in parenting skills and now seeks to blame a third party for her lack of effort.

Appellant quotes the following language from *In re Welfare of K.P.C.* in a further effort to analogize to that case and explain her lack of contact with M.J.L.:

> The main reason behind the trial court's termination decision seemed to be the court's concern over the mother's failure to exercise her visitation rights, and apparent unconcern over whether she got her children back or not. * * * It is interesting to note that right after the children were taken from her, the mother visited them regularly and often. The longer they stayed away, however, the less she saw them. It seems almost as though the system in this case defeated its purpose; that is, rather than increase the mother's determination to reunite her family, the increasing court involvement made her increasingly pessi-

mistic about the possibility of reuniting her family. It does not seem surprising that she should feel helpless in the face of the odds against her.

*In re Welfare of K.P.C.*, 366 N.W.2d at 715.

Yet, this is not a case in which appellant's child was removed from her due to inadequacies with a substantial economic basis, nor was she faced with an unyielding social service that was keeping her child from her. Appellant left her child voluntarily to be with her second husband on the road, seeing M.J.L. at most monthly over a four year period. Additionally, appellant's recent move away from her child to live in the parental home of a male friend indicates a perpetuation of that voluntary conduct. *See In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn.1980) (evidence relating to termination must address conditions that exist at the time of the hearing). Her distance from her child has been caused by her own actions, not the actions or neglect of Koochiching Family Services.

■ The trial court also terminated appellant's parental rights because M.J.L. was "neglected and in foster care." *See* Minn.Stat. § 260.221(b)(7) (1986). "Neglected and in foster care" means a child:

(a) Who has been placed in foster care by court order; and

(b) Whose parents' circumstances, condition, or conduct are such that the child cannot be returned to them; and

(c) Whose parents, despite the availability of needed rehabilitative services, have failed to make reasonable efforts to adjust their circumstances, condition or conduct, or have willfully failed to meet reasonable expectations with regard to visiting the child or providing financial support for the child.

Minn.Stat. § 260.015, subd. 18 (1986).

Factors to be considered in such a determination include:

(1) The length of time the child has been in foster care;

(2) The effort the parent has made to adjust circumstances, conduct, or condition to make it in the child's best interest to be returned to the parent's home in the foreseeable future, including the use of rehabilitative services offered to the parent;

(3) Whether the parent has visited the child within the nine months preceding the filing of the petition, unless it was physically or financially impossible for the parent to visit or not in the best interests of the child to be visited by the parent;

(4) The maintenance of regular contact or communication with the agency or person temporarily responsible for the child;

(5) the appropriateness and adequacy of services provided or offered to the parent to facilitate a reunion;

(6) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time; and

(7) The nature of the effort made by the responsible social service agency to rehabilitate and reunite the family.

Minn.Stat. § 260.155, subd. 7 (1986). While the trial court's findings do not explicitly cite the required factors, the findings do address them all in substance. Certainly, trial court findings that explicitly track the requirements of the statute are preferred. The trial court's findings, though brief, on the whole comply with the dictates of Minn. Stat. § 260.015, subd. 18 and Minn.Stat. § 260.155, subd. 7.

## DECISION

The trial court's termination of the mother's parental rights was supported by clear and convincing evidence.

Affirmed.