In re the Matter of the **WELFARE OF D.C., Child.**

No. C2–87–878.

Court of Appeals of Minnesota.

Dec. 8, 1987.

Hugh T. Nierengarten, Nierengarten & Hippert, Ltd., New Ulm, for appellant father.

Bruce C. Young, Asst. Co. Atty., Madelia, for Watonwan County.

Michael P. Kircher, St. James, for D.C., Child.

Heard, considered and decided by SEDGWICK, P.J., and PARKER and HUSPENI, JJ.

## OPINION

SEDGWICK, Judge.

Clyde Cooper appeals the termination of his parental rights to D.C. claiming a lack of clear and convincing evidence for termination under Minn. Stat. § 260.221(b)(2), (4), (5), (7) (1986). We affirm.

## FACTS

D.C. was born May 5, 1983, to Terrie and Clyde Cooper. When D.C. was fourteen months old, he was put into emergency foster care following a neighbor's report that D.C. and his half-brother, D.A., were left alone.

Two days earlier, Cooper had left for two weeks with the National Guard at Camp McCoy. When he returned home, his wife and children were gone. His wife returned home the next morning claiming she had been abducted by two men and taken to Mankato. Terrie told him the children were with a babysitter but she had forgotten which one. Cooper learned the children were in foster care when he discovered a court notice in the trash. Cooper contacted the social service agency. On the date for the hearing on a neglect petition, Cooper and his wife, represented by counsel, signed a substitute care plan which continued the foster care and set various objectives for the Coopers to meet before the children could be returned home. The neglect petition was continued without a hearing.

From August 24, 1984, through 1986, a series of substitute care plans were signed. All continued foster care because neither parent could care for the children. All plans were reviewed by the court and Cooper, who was at all times represented by counsel. Objectives common to all the plans required appellant to visit D.C. in the foster home three times a week to maintain the parent-child bond, improve parenting skills through parenting classes and counseling, create a clean, safe, healthy home environment for children under five, and obtain full-time employment and a high school equivalency diploma in order to provide adequate food and shelter for the children. The objectives applied to both Cooper and his wife until their separation in December 1984. In January 1985, Cooper and his wife stipulated to the dependency of D.C. and D.A.

Terrie consented to termination of her parental rights in June 1986. A hearing on a petition to terminate Cooper's parental rights was held in March 1987. The trial court found, among other things, that Cooper had made minimal effort toward visiting D.C., that Cooper refused inspection of his home, that Cooper's parenting skills have not improved significantly despite the efforts of the social service agency, that the social service agency had made reasonable efforts to reunite Cooper and D.C., that all professionals recommended termination of Cooper's parental rights, and that the conditions existing at the time of the hearing will continue for a prolonged and indefinite period of time. The court concluded that it was in the best interests of D.C. to terminate Cooper's parental rights under Minn. Stat. § 260.221(b)(2), (4), (5), (7).

## ISSUE

Was the termination of parental rights based on clear and convincing evidence under Minn. Stat. § 260.221(b)(2), (4), (5), (7)?

## ANALYSIS

The scope of review of the termination of parental rights is broad and the standards are stringent. *In re Welfare of M.J.L.*, 407 N.W.2d 714, 717 (Minn.Ct.App.1987). On review, "while this court will give some deference to the trial court, it will closely inquire into the sufficiency of the evidence to determine whether the evidence is clear and convincing." *In re Welfare of Clausen*, 289 N.W.2d 153, 156 (Minn.1980).

Termination of parental rights involves balancing the interests of both the parent and the child. The best interests of the child is the paramount consideration. *In re Welfare of J.J.B.*, 390 N.W.2d 274, 279 (Minn.1986). The court has recognized that

> long-term placement [in foster care] is often inconsistent with * * * the right of all children to live in families that offer a safe, permanent relationship with nurturing parents or caretakers and have the opportunity to establish lifetime relationships.

*Id.* The best interests of the child are balanced with the law's presumption that the natural parent is a fit and suitable person to be entrusted with the care of his child. *Id.*

■ To overcome this presumption, the petitioner has the burden of proving specific statutory grounds for termination of parental rights by clear and convincing evidence. *See In re Welfare of Rosenbloom*, 266 N.W.2d 888, 889 (Minn.1978). This burden of proof remains even where there has been a prior finding of dependency or neglect. *In re Welfare of Barron*, 268 Minn. 48, 53–54, 127 N.W.2d 702, 706 (1964). Under Minn. Stat. § 260.221(b), the petitioner need only provide sufficient evidence to support clear and specific findings of one of the statutory conditions. *See In re Welfare of R.M.M.*, 316 N.W.2d 538, 540–41 (Minn.1982). The evidence relating to the termination "must address conditions that exist at the time of the hearing * * * [and] it must appear that the present conditions of neglect will continue for a prolonged, indeterminate period." *In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn.1980).

■ Here, the substitute care plans list objectives designed to correct the conditions leading to neglect or dependency, to aid Cooper in complying with his parental duties, and to aid him in being a fit parent. *See* § 260.221(b)(2), (4), (5).

The real argument raised by appellant is that the county failed to provide him with enough resources to correct the conditions that kept D.C. in foster care for three and one-half years. Appellant argues that he should have been told how to apply for low income housing and that AFDC should have been made available to enable him to parent his child.

The position of the county is that if he had taken the initiative to get his general equivalency diploma and find employment, he could have provided a home for the child; if he had exercised his visitations and made some effort to parent the child, they would have a relationship at this time other than that of playmates; and that he was never eligible for AFDC because he never indicated he was ready to accept parental responsibility for D.C.

At the time the children were placed in foster care, the condition of the home in which they had been living was marginal at best, with animal feces in parts of the house where food was kept and little effort made at minimal cleanliness. The county thus required parenting classes which were resisted by Clyde until shortly before the hearing on termination. Counseling was made available, and required by the county and agreed to by Clyde, because of his constant preoccupation with killing, death and violence. He never availed himself of the counseling sessions. The only time in three and one-half years that Clyde indicated he was ready to care for D.C. was the day of the termination hearing. He testified that four hours a week was all the time he could spend with his child.

Clyde was at all times represented by counsel. At the November 18, 1985, hearing, his attorneys requested that the county's objectives be listed in order of priority. He was aware that visitation was the number one priority to accomplish bonding with

the child. Three two-hour sessions each week were set up at his convenience. He chose to exercise only half of his visits. Although he called the foster mother when he didn't come, he never asked to reschedule a visit. The county paid for gas for visitation.

Clyde's real interest is the National Guard. He missed visitation with his son so he could do volunteer work to help guard members maintain their standing. He receives $127.96 monthly from the National Guard to cover 16 hours of required duty. He hopes his enthusiasm for the organization will enable him to gain full-time employment sometime in the future. In the meantime, he will not seek his GED or paid employment.

He refused to show Blue Earth County social worker Jeanette Ziegler the bedroom he proposed to share with D.C. because he did not want her to see the military gear he kept there. However, at the termination hearing he said the gear had been returned to the National Guard. Clyde consistently said the home he shared with his mother and uncle was not suitable for the child because the landlord would not make repairs because the house was not habitable. The water pump worked infrequently, and the sole source of heat was a wood stove which Clyde agreed to protect with a grate, which he never got around to installing.

The most important aspects of being a parent on a day to day basis were discussed by Ziegler with Clyde. They are:

The daily part of being a parent, however, is a much larger circle, because there are many more responsibilities in being the daily parent. The primary thing again is love. But there's also discipline, and daily routine; meal times; baths; bedtime; the other things, food, clothing, shelter. And for young children Dale's age, hugs, kisses, comforting when the child is ill or hurt; ideas of what's right and wrong; someone to share joys and sorrows with; someone to give allowances; assign chores appropriate to the child's age; and someone to play with. Also celebrate holidays and different celebrations. * * * However, this is the part that we as social workers tend to deal mostly with in parents, and try to help them understand and accomplish a variety of things. A child can not live on just love and play. He needs to have all these other things in his daily routine, and this is what we try to help parents who have been separated from their children learn how to do more appropriately.

Of all aspects listed, the only one Clyde has accomplished in three and one-half years is play.

In the six visits. Ziegler observed, the child showed little affection toward Clyde and only once did he give the child a good-bye kiss and hug. Notwithstanding the child's special speech needs, as carefully explained to Clyde, he would confuse D.C. by speaking to him in Korean and counting in Spanish. D.C. has trouble with English.

Clyde's mother testified he was capable of being a good parent "if he has a little supervision." Clyde has never initiated conversations or questions about the child, what he likes or dislikes, his habits, toilet training, playmates or any other aspect of the child's needs.

On December 22, 1986, when D.C. had to be moved because of problems in the foster home, Ziegler called Clyde and told him she was having trouble finding a home for the child. Clyde did not call to find out where he was until February 12, 1987, when his attorney said he should visit a couple of times before the court hearing. It is Clyde's position that it was Ziegler's responsibility to call him.

This record clearly and convincingly supports the trial court's findings that Clyde Cooper has provided only minimal cooperation with the county's efforts to reunite him with his child and that he completed these minimal requirements only shortly before a court hearing so as to be in compliance at the time of the hearing. The minimal compliance with visitation of his son is in stark contrast to the time and energy he volunteers to the National Guard and Alcoholics Anonymous, supporting the trial court's observation "that his involve-

ment with the National Guard is more important to him than visiting his child."

D.C. has been in foster care since January 1985, and the record supports the trial court's findings that "the conditions existing at the time of the hearing will continue for a prolonged and indefinite period of time and the child [D.C.] could not be returned to Clyde Cooper within the foreseeable future."

We believe that a parent has a duty to maintain the relationship of parent-child with a child in foster care; that clear, identifiable and reasonable goals were set after consultations between this father, the human services agency, and father's attorney; and in spite of reasonable efforts Clyde is not motivated to maintain such a relationship with D.C.

Grounds for termination of parental rights exist under Minn. Stat. § 260.221(b)(2), (4), (5), (7).

## DECISION

Affirmed.

HUSPENI, Judge (dissenting).

I respectfully dissent and would reverse the termination of parental rights adjudication. I agree with the majority that our scope of review in these cases is broad, and a review of the record convinces me that the evidence before the trial court was not clear and convincing and did not support a determination that this parent-child relationship must be irrevocably ruptured.

Appellant surely is not a perfect father. If that were the standard, few children would be reared by natural parents. He has no burden to prove his fitness, however. It is the state which must show that he has substantially, continuously, or repeatedly refused to fulfill his parental duties or that he is unfit, that he has failed to correct the conditions leading to the dependency of the minor child, or that the child is neglected and in foster care. I

submit none of these conditions was demonstrated by clear and convincing evidence. Instead, I believe the record demonstrates reasonable efforts by a father whose child was removed from the home during the father's absence, to comply with the changing standards and demands placed upon him.

Social service agency caseworkers often face frustration on a daily basis as they work with parents in dysfunctional families. Initially the caseworker may be called upon to establish a case plan. Next, substantial effort may be expended to assist and encourage the parent to meet case plan goals so that parent and child may be reunited. In a substantial number of cases, progress in meeting case plan goals is slow or nonexistent. At some point in such cases, the caseworker may consider commencement of a termination of parental rights proceeding. Can a caseworker both continue efforts to assist a parent to meet case plan goals and reunite a separated family, and simultaneously document the failure to meet those same case plan goals in order to support a petition for termination of parental rights? The answer, at least in this case, should be "no."

By way of illustration, it appears that the issue of appellant's visitation with the minor child was of substantial importance to the caseworkers in deciding that appellant's parental rights should be terminated. However, I am concerned that while appellant's participation in fifty percent of the scheduled visitations was deemed acceptable when caseworker efforts were concentrated on facilitating reunion of father and child, this same level of compliance was deemed unacceptable after the decision had been made to go forward with a termination of parental rights proceeding.

There are other indications in the record, I believe, which substantiate the "changing rules" associated with appellant's involvement with the county's personnel.[1] When

1. For example, two psychological evaluations of appellant were conducted. The first, dated February 28, 1985, states that appellant was referred "to aid in case planning and as part of a custody study." The second evaluation, dated

July 8, 1986, states that appellant was referred "as a step in preparing for a review by the court later this year with respect to possible termination of parental rights." In addition, during the termination of parental rights proceeding,

the projected result of caseworker involvement was reunification of this family, appellant's activity appears to have been measured by a generous yardstick and termed "progress." However, when the county's focus shifted and the projected result of caseworker involvement became termination of appellant's parental rights, this same activity appears to have been measured by a far harsher yardstick and termed "failure."

In expressing these concerns, I do not minimize the fact that county welfare agencies often have severely limited resources —both human and monetary—and must avoid unnecessary duplication of caseworker involvement in any individual case. However, I urge consideration and implementation of policies which would assure that caseworkers are not forced to pursue simultaneously two inconsistent goals: reunification of a dysfunctional family and documentation of evidence to support a termination of parental rights proceeding. Such pursuit serves neither the rights of the parents nor the best interests of the minor child.

the caseworkers appeared to place emphasis on appellant's inability to engage in appropriate play with the minor child or to progress beyond a "playmate" stage to a "parenting" one. Yet, appellant was described in earlier caseworker reports as using some "suggestions given him regarding appropriate play with [the minor child] when outdoors. * * * This was a major improvement over the usual routine of horsie back rides, wrestling, running and screaming like two little children."