*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-0880**
**A15-0882**

In the Matter of the Welfare of the Children of:
R. B. and T. B., Parents

**Filed December 7, 2015**
**Affirmed**
**Randall, Judge**[*]

Chippewa County District Court
File No. 12-JV-15-116

Spencer H. Kvam, Holmstrom & Kvam, PLLP, Granite Falls, Minnesota (for appellant R.B.)

Krystal M. Lynne, Stermer & Sellner, Chtd., Montevideo, Minnesota (for appellant T.B.)

David M. Gilbertson, Chippewa County Attorney, Montevideo, Minnesota (for respondent Chippewa County Family Services)

Susan E. Peterson-Bones, Granite Falls, Minnesota (guardian ad litem)

Considered and decided by Schellhas, Presiding Judge; Cleary, Chief Judge; and Randall, Judge.

**UNPUBLISHED OPINION**

**RANDALL**, Judge

In these consolidated appeals, appellant parents argue that the district court erred by terminating their parental rights. We affirm.

_____
[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

FACTS

Appellants, R.B. (mother) and T.B. (father) are the parents of a daughter born in 2007 and a son born in 2010.[1]  Respondent Chippewa County Family Services (the county) first became involved with the family upon the mother's request in July 2012. Between July 2012 and October 2012, the county connected mother with domestic-violence assistance and provided appellants with parenting assistance and individual, marital, and in-home counseling.  The county had over 60 contacts with the family or service providers between July and October 2012.  Despite these contacts, daughter missed a mental health evaluation and mother reported accidentally injuring herself after drinking.  The county also had serious concerns about the messy and dirty condition of the home, the safety of the children, and the fact that the mother's older children were acting as parents to daughter and son, who were described as "out of control."

On October 25, 2012, a Child in Need of Protection or Services (CHIPS) file was opened when mother was arrested for driving her children to school while intoxicated. Son, who had a scratch and bruise on his face, was in the vehicle at the time of mother's arrest.  Between October 2012 and November 2013, the county provided numerous services, including counseling, in-home therapy, a chemical-health assessment and two treatment opportunities for mother, payment of the family's water bill, and summer programs for daughter and son.  However, numerous problems remained, including: the

---

[1]R.B. is also the mother of three other children born in 2000, 2002 and 2003, respectively.  While these children were initially part of the CHIPS petition, they were dismissed from the case when their father, N.S., was given sole legal and sole physical custody of them by another court in August 2014.

children missing or being tardy for school; known drug users and dangerous people spending time at the residence; appellants' continued use of alcohol and controlled substances; a lack of appropriate winter clothing and supervision for the children; and the electricity was shut off. Despite mother's unsuccessful discharge from both outpatient and inpatient treatment and the discontinuance of family-based in-home services, the county closed its child protection case on November 30, 2013.[2]

On June 3, 2014, the county opened a second child protection case after school district officials investigated mother's children's absences and reported hazardous conditions at the residence. The school officials had found daughter and son outside the residence unsupervised, barefoot and throwing bricks. The school officials also had difficulty waking mother, who told them that father had left two days before with the family's money and that she would not clean the residence because the family was being evicted. That same day, the county visited the residence and discovered numerous safety hazards and suspected that mother had been using controlled substances and offered to transport her to chemical testing. Mother stated that she would find a ride and signed a safety plan which provided that she would follow supervision guidelines, have a chemically-free home, ensure the children attended school, clean the residence, and remove the safety hazards.

---

[2] The child protection specialist who managed both of the CHIPS cases stated that there was "no reason to continue in the home" despite the agency's concerns because mother was passing her chemical substance tests, appellants had completed the "Incredible Years" parenting classes, and there were no new law enforcement or child protection reports.

After mother failed to appear for alcohol testing, the county eventually visited the residence. Mother delayed leaving for alcohol testing, failed to produce a sample, and was angry and unhelpful by refusing to answer questions, sign releases of information or acknowledge the safety hazards in the residence. Mother's older children reported ongoing concerns about visitors, the condition of the residence, the absence of food, the imposition of parenting responsibilities on them, lack of supervision, chemical use, and the fact that mother had left the children in the care of a person who is severely mentally ill. The county took all of the children into protective custody on a 72-hour peace officer hold because it could not guarantee their safety if they remained in the residence. Daughter and son were placed in foster care on June 4, 2014.

On June 6, 2014, a CHIPS petition was filed, which according to the district court's order, asserted that the "children were persons whose condition, environment, or associations are such as to be injurious or dangerous to the children or others." On June 13, 2014, the district court ordered appellants to submit to alcohol testing following the admit/deny hearing, reviewed permanency timelines, continued the out-of-home placement, and ordered that appellants be subject to random chemical testing and abstain from alcohol and mood-altering chemicals.

On June 24, 2014, the parties reached an agreement to continue the CHIPS matter for dismissal until September 23, 2014. The agreement provided that the children would remain in foster care until: appellants independently obtained clean and safe housing; mother addressed her mental health issues, did not use alcohol or mood-altering substances, and wore a secure continuous remote alcohol monitor (SCRAM) bracelet to

4

monitor chemical use, and undergo random alcohol testing; father did not use alcohol or mood-altering substances while in the presence of the children or within 24 hours of seeing them; appellants cooperated with the county and the guardian ad litem; and appellants signed all releases of information. Appellants had six supervised visits with the children between June 4, 2014 and September 23, 2014. Appellants passed all alcohol tests administered by the county after each of these visits.

On July 3, 2014, the county prepared separate case plans for daughter and son. Upon discovering that appellants had moved to Hutchinson, Minnesota, on or around July 1, 2014, the county encouraged appellants to contact Heartland Community Action with McLeod County Social Services to apply for housing assistance, offered to go to Hutchinson to help them apply for services and look for housing, attempted to set up an in-home worker to assist with housing, and encouraged them to contact their families for additional help with housing. Both appellants obtained employment in Hutchinson but resided in a tent and motel until they moved into the Economy Inn in August 2014. Mother also started counseling, which included a diagnostic assessment and two follow-up appointments in August and early September 2014. However, arranging the in-home worker and the SCRAM bracelet monitoring was difficult because appellants failed to return the county's telephone calls. During the summer of 2014, the county frequently met with the children and provided them with foster care services and medical checkups, enrolled son in full-time Kinder Kare, attempted to start daughter in counseling and enrolled her in community education, coordinated visits with family members, and met frequently with the children. The county also conducted a relative-placement search but

5

none of the children's relatives were able to take the children in permanently. Son did well in placement, but daughter struggled and desired to live with appellants.

On September 23, 2014, the continuance for dismissal ended because "among other things, [appellants] had not found permanent, safe, and appropriate housing." Although appellants admitted that they could not provide permanent shelter and therefore that their children were in need of protection and services, the children were placed with appellants on a trial home visit because the county found that the motel in which they were residing was safe and clean.

On September 26, 2014, appellants returned to Montevideo for an employment opportunity that allowed them to work at a motel in exchange for a residence in the attached manager's quarters. However, appellants were not paid for their services. On October 20, 2014, the county filed out-of-home-placement plans, which provided that the trial home visit would end if chemical use, lack of supervision of the children, or unsafe living conditions occurred. In its order, the district court referred to the case plan which, according to the district court's summary, provided that the county would provide the following services:

> With regard to basic needs, family services would make referral for the children for winter coats, hats, mittens, snow pants, and boots. Emergency food would be provided through the Chippewa County Food Shelf. Parenting education, in-home family therapy, counseling, therapy, and other mental health services would be provided through Woodland Centers. Childcare services would be provided through Kinder Kare. Chemical health services would be provided and would consist of the Chippewa County Sheriff's Department monitoring the SCRAM bracelet. [The county] would pay the costs for the SCRAM bracelet and also provide random UA's.

6

> [The county] would pay the transportation costs for [son] to ride the bus to and from Kinder Kare. [The county] would provide for referral to the Workforce Center for employment services.

The county provided these services and also assisted mother in completing and turning in a food-support application. The county provided approximately 600 contacts with the family, activities on the case, or consultations with related agencies from June 3, 2014 through December 23, 2014. The child-protection specialist met with appellants at least weekly, but, according to testimony, "most of the time it was two to three times a week" while appellants resided at the motel.

During the trial home visit, mother passed all of her chemical tests and complied with the SCRAM-bracelet rules. Mother completed her updated diagnostic assessment with Woodland Centers on November 19, 2014, and met with her doctor for medications on October 20, 2014. Mother did not attend five health appointments between November 2014 and January 2015. There were also only two in-home sessions in November and December 2014 due to cancellations because of weather, the children being in respite care, and appellants choosing to cancel sessions.

On November 5, 2014, the county became concerned about chemical use in the home because the children were not timely attending school and were being locked out of the residence in the cold weather. Appellants appeared to be avoiding the county, and the county requested they complete chemical testing. While mother tested negative, father's

7

November 6, 2014 test was positive for methamphetamine.[3] On November 14, 2014, the county met with appellants to discuss whether the trial home visit would continue. Father admitted to using methamphetamine and was agitated and angry. The parties agreed that father would test three times per week and that the trial home visit could recommence. This requirement was ordered by the district court at the December 23, 2014 review hearing. Father did not complete the testing three times per week.

In early December 2014, the housing situation at the motel appeared to be deteriorating. Due to her concern, the child-protection specialist provided mother with information about one local low-income housing option and an application to the only other one low-income housing option in the county. Mother did not contact the first option or initiate an application for the second. Appellants continued residing with the children at the motel until mid-January 2015.

Both children experienced chronic absenteeism, injuries, and untreated medical issues during the trial home visit. When mother explained that son's 42-percent absence rate was due to transportation issues, the county purchased a two-month bus pass for him. Daughter's school contacted the county on December 4, 2014 concerning her excessive absences and tardiness, academic concerns, and a large bruise on her cheek caused by another child at the residence throwing an object at her. On January 6, 2015, the county found a cut on daughter's arm inflicted by an unknown child at the residence. The cut required stiches and was infected, but appellants had not taken daughter to the doctor.

---

[3] Father disputes the accuracy of this test. However, according to testimony, he admitted to using methamphetamine when the county met with appellants on November 14, 2014.

Son has a breathing disorder that requires medical treatment. Kinder Kare advised the county on two occasions of concern about his condition. The county reminded and assisted mother with replacing the equipment parts and medication. The county later found son's medication unopened under a pile of clothes.

The children were unsupervised when the county came to visit the family at the motel on January 6, 2015. That same day, father was directed to remain out of the residence and not be a caregiver to the children because of his chemical use. Father was allowed to have visits that were to be supervised by mother until he was compliant with the district court's order and safety plan. Father was irritable and swore in front of the children during this visit. He also had two black eyes from a fight at the motel. Father had been directed to test and to obtain a chemical use assessment but failed to do either. Mother was given a short written summary explaining what she needed to do to continue the trial home visit, advised of permanency timelines, and reminded not to permit father to be in the residence or care for the children until he was compliant with the court order. Despite this exchange, father transported son to Kinder Kare three days later. Father did not attend any of the three chemical-health assessments scheduled for him in January and early February 2015, but completed swab tests on January 7, 9, and 12, 2015.[4]

On January 9, 12, and 13, 2015, the county visited the motel and found the property to be damaged. There was garbage in the home, old food containers, food wrappers, cigarette butts, and clothing littering the floor. Mother was directed to clean

---

[4] Father alleges that he complied with the case plan by testing and scheduling a chemical-use assessment. Undisputed testimony shows that father did not test three times per week as required and did not complete the chemical-use assessment.

the home but did not do so. On January 10, 2015, the owner of the motel terminated appellants' employment and demanded that they leave. On January 13, 2015, the county returned the children to foster care due to safety concerns.

On January 15, 2015, mother told the county that she was looking at trailers in Montevideo and was hoping to buy one. However, appellants had no further contact with their children, the guardian ad litem, or the county from January 15, 2015 until mother contacted the county on February 17, 2015. The county attempted to reach out to appellants numerous times during the month they were gone, including contacting family members and friends.

On February 13, 2015, the county filed a Petition for Termination of Parental Rights. On that date, the children had been placed out of the home for 253 days.[5] The guardian ad litem, who met with daughter ten times during the case and son six times, reported that daughter was worried, sad, and felt as though she had been left behind. Daughter reported feeling safe at the foster home, but expressed a preference for residing with her parents. The guardian ad litem testified that daughter asked: "Will I have a forever home to live at?" The guardian ad litem confirmed that the children are bonded with each other, stated that the foster family is not an option for permanent placement, and opined that the children would be adopted quickly. The children are also bonded with their grandmother, but she told the county that she was unable to be a permanent placement. The grandmother indicated that the county's services were appropriate to

---

[5]A trial home visit counts toward the accumulation of out-of-home placement time. Minn. R. Juv. Prot. P. 42.01, subd. 4(c).

address appellants' housing, chemical dependency and mental health concerns, but that the services were ineffective because appellants needed to be "taught" how to request services, make appointments, and otherwise parent.

By the time of trial on April 17, 2015, appellants had not established a permanent residence nor seen the children since January 13, 2015.[6] Father did not testify at trial, but mother testified that she had been staying with people or in motel rooms since January 15, 2015. Mother also testified concerning her mental health diagnoses that she is compliant with her medications, and that she participated in but did not complete a mental health program at Woodland Centers. Mother also testified that she needed her children in her custody to qualify for available programs, but did not explain why she did not qualify for the programs during the trial home visit. Additionally, father completed a thirty-day work and chemical dependency treatment program at the Salvation Army shortly before trial. The district court terminated both parents' parental rights, each parent filed a separate appeal, and this court consolidated those appeals.

## DECISION

Parental rights may be terminated "only for grave and weighty reasons." *In re P.T.*, 657 N.W.2d 577, 591 (Minn. App. 2003), *review denied* (Minn. Apr. 15, 2003) (quotation omitted). Termination is appropriate where clear and convincing evidence supports at least one statutory ground for termination, and termination is in the best interests of the child. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn.

---

[6] The district court suspended parenting time on March 11, 2015 but re-instated mother's on March 25, 2015. Father's parenting time was suspended pending his release from treatment and does not appear to have been reinstated before trial.

11

2008).  This court reviews a district court's factual findings "to determine whether they address the statutory criteria for termination and are not clearly erroneous." *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 665 (Minn. App. 2012).  If the district court's finding address the statutory criteria for termination and are not clearly erroneous, this court review for an abuse of discretion a district court's decision to invoke a particular statutory basis for involuntarily terminating parental rights.  *In re Welfare of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011); *see In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136 (Minn. 2014) (stating that "termination of parental rights is always discretionary with the juvenile court").  So long as the record provides clear and convincing support for termination, this court defers to the district court's determination that the statutory requirements for termination have been established.  *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 899-900 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

Here, appellants challenge the district court's determination that termination was in the children's best interests, and that (a) reasonable efforts by the county failed to correct the conditions leading to the children's out of home placement; and (b) the children were neglected and in foster care.  *See* Minn. Stat. § 260C.301, subd. 1(b)(5), (8) (2014) (respectively).  We conclude that the record supports the district court's determination that the county's reasonable efforts failed to correct the conditions leading to the children's out-of-home placement.  We do not need to address the parent's argument regarding whether the children were neglected and in foster care.  *See In re Welfare of the Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004); Minn. Stat. § 260C.301, subd. 1(b) (2014); Minn. R. Juv. Prot. P. 39.04 (providing that termination

may be ordered for a number of statutorily defined bases, and as long as at least one ground is supported by clear and convincing evidence, and termination is in the child's best interests, this court must affirm).

## I. Reasonable Efforts

A district court may terminate parental rights if clear and convincing evidence shows that reasonable efforts have failed to correct the conditions leading to the child's out-of-home placement. Minn. Stat. § 260C.301, subd. 1(b)(5); *S.E.P.*, 744 N.W.2d at 385. It is presumed that reasonable efforts have failed upon a showing that (1) a child under the age of eight has resided outside the parental home for six months, unless there is regular contact and the parent has substantially complied with the out-of-home placement plan; (2) the court approved an out-of-home placement plan; (3) the conditions leading to the child's out-of-home placement have not been corrected; and (4) reasonable efforts have been made by the social-services agency to rehabilitate the parent and reunite the family. Minn. Stat. § 260C.301, subd. 1(6)(5).

Here, appellants argue that the district court should not have based its decision to terminate their parental rights on their poverty and homelessness. Appellants also allege that the conditions leading to the children's out-of-home placement have been corrected and that the county failed to make reasonable efforts to rehabilitate them, consider mother's mental health issues, and reunite the family.

### A. *Correct the conditions leading to out-of-home placement*

Mother argues that appellants corrected the conditions leading to the children's out-of-home placement because the family "did have a safe place to live." The reason for

the initial placement was that "the children were persons whose condition, environment, or associations are such as to be injurious or dangerous to the children or others." The basis for this determination was the county's finding that the children lacked supervision or were being supervised by unsuitable adults, their residence was dirty and hazardous, suspected chemical use by appellants, the children were chronically absent or tardy, and there was an absence of food in the residence.

The record demonstrates that many of these conditions were not corrected when the children were returned to foster care in January 2015. Father was non-compliant with the case plan regarding his chemical use. Mother was non-compliant with the case plan by allowing father to interact with the children without completing his chemical health assessment and testing and without her supervision. Noncompliance with a case plan is one way to prove a failure to correct conditions leading to out-of-home placement pursuant to Minn. Stat. § 260C.301, subd. 1(b)(5)(iii). *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 663 (Minn. 2008).

Additionally, the children continued to have chronic absenteeism and tardiness in school. Appellants failed to treat daughter's injury or son's breathing disorder, despite prompting and assistance from the county. Mother continued to have difficulties properly supervising the children. The motel was in terrible condition due to garbage in the home, old food containers, food wrappers, cigarette butts, and clothing littering the floor, and mother did not clean the home when directed. These conditions were similar to those the children were found in on June 3, 2014.

While father completed a 30-day work and chemical-dependency treatment program at the Salvation Army and mother partially completed a mental-health program shortly before trial, the record demonstrates that neither had established a permanent residence by the time of the April 2015 trial. This court has also held that "improvement immediately before the termination hearing" can be insufficient to overcome "the whole of [a parent's] negative track record." *In re Welfare of J.K.*, 374 N.W.2d 463, 466 (Minn. App. 1985), *review denied* (Minn. Nov. 25, 1985). There is clear and convincing evidence to support the district court's finding that appellants failed to substantially comply with their case plans and therefore did not correct the conditions leading to the children's out-of-home placement.[7]

### B. *Reasonable efforts to rehabilitate and reunite the family*

In determining if efforts were reasonable, a district court considers whether the services were "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h) (2014). When determining whether reasonable efforts were made, the district court must examine "the length of the time the county was involved and the quality of effort given." *In re Welfare of H.K.*, 455 N.W.2d 529, 532 (Minn. App. 1990),

---

[7]Mother cites the district court's conclusion that "[t]he current living arrangement has been stable and satisfactory" to support her assertion that the family's residence was stable and satisfactory. However, when read in context, the statement clearly refers to the foster care placement of the children at the time of trial. Even if mother's interpretation were correct, it is clear that the motel was neither safe nor stable at the time the children were removed, as evidenced by the property damage, dirty conditions, and the fact that appellants were asked to leave.

*review denied* (Minn. July 6, 1990). The county's efforts must be directed towards alleviating the conditions that gave rise to the children's out-of-home placement and conform to the problems presented. *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 88 (Minn. App. 2012) (citation omitted). And these efforts must "go beyond mere matters of form" to include genuine assistance that is tailored to a parent's needs. *In re Welfare of J.A.*, 377 N.W.2d 69, 73 (Minn. App. 1985), *review denied* (Minn. Jan. 23, 1986).

Appellants argue that the "main goal of the CHIPS proceeding was housing and the basis for the CHIPS adjudication was the lack of stable housing." Appellants allege that the county's services were inadequate because the only housing assistance provided to them were the information and applications provided to mother.[8] However, while appellants admitted the children were in need of protection and services due to a lack of necessary shelter, the actual reason for the initial placement was that "the children were persons whose condition, environment, or associations are such as to be injurious or dangerous to the children or others." Appellants do not address the other issues that led to the children being taken into emergency protective custody on June 4, 2014 and the commencement of the CHIPS proceedings, namely: the lack of supervision or

---

[8]Mother alleges that the only housing assistance offered to the family were two applications provided after appellants were evicted in January 2015. Contrary to this assertion, the record clearly demonstrates that the county actively attempted to engage with appellants in seeking suitable housing after they relocated to Hutchinson, Minnesota in July 2014, including offering an in-home worker, and that the county provided mother with information about the only two local low-income housing option in the county when the housing situation at the motel appeared to be deteriorating in early-December 2014, a month prior to appellants' eviction. The county could not have offered more housing assistance to appellants between January 15 and February 17, 2015 because they could not be found.

16

supervision by unsuitable individuals; the dirty and unsafe conditions in the residence; chemical use; and the absence of food. Many of these issues were the same as those during the first child welfare case.

The undisputed evidence shows that the county has provided a myriad of services to assist appellants in addressing these issues for several years. During the first case in June 2012 until November 2013, the county provided: counseling, in-home therapy, parenting classes, chemical-health assessment and treatment options for mother, summer programs for daughter and son, and payment of their water bill. During the present case, the county provided: referrals for winter clothing; medical care for the children; emergency food aid and assistance with applying for food support; parenting education, in-home family therapy, individual therapy to address mother's mental-health concerns and counseling for daughter; payment for mother's SCRAM bracelet and both appellants' chemical testing; payment for transportation costs for son's bus rides to and from Kinder Kare; referrals to the Workforce Center for employment services; offers to assist in locating housing when appellants re-located to Hutchinson in July 2014; and information about one local low-income housing option and an application to the only other low-income housing option in the county when the motel no longer seemed to be a suitable housing option in December 2014.

The services provided have been both ongoing and intensive. The county has worked with appellants since 2012, creating and updating court-approved case plans with which appellants did not substantially comply. The county provided approximately 600 contacts with the family, activities on the case, or consultations with related agencies

17

from June 3, 2014 through December 23, 2014. The child-protection specialist met with appellants at least weekly, but "most of the time it was two to three times a week" while the family resided at the motel. The county also continued to meet with or reach out to appellants, their family members, and friends throughout early 2015. The county only ceased to provide substantial services to appellants after they disappeared on January 15, 2015.[9] As discussed above, the record demonstrates that even with the benefit of these services, appellants have not made sufficient progress towards meeting their basic needs or the needs of their children.

Mother argues that the county and district court should have given more consideration to her mental-health issues. Mother claims that the county "merely referred her to see a counselor," and that its efforts were not reasonable because it failed to recognize that an individual with five different mental-health issues "is likely going to have difficulty with referrals and making phone calls." But the record demonstrates that the family was provided with in-home family therapy, which was cancelled numerous times, and that mother was provided with individual therapy, required to meet with her provider and follow the provider's recommendations, including taking medications as prescribed. Mother also testified at trial that she was compliant with her medications and took the initiative to apply for and attend a mental-health program without the county's

---

[9]Father states that the county did not provide "any further services" after January 13, 2015. However, the record clearly demonstrates that the county contacted appellants' family members and friends to attempt to locate them, provided foster care, reached out to relatives to search for possible permanency options, and attempted to schedule supervised visits for appellants and the children. Father also does not assert what services the county should have provided after January 13, 2015.

assistance, though she failed to attend the entire program. This fact indicates that mother was able to reach out for services and remain compliant with her medications on her own accord, but chose not to during the majority of the case plan. The district court considered the impact of mother's mental-health issues had on her ability to provide for the children, which is consistent with caselaw. *See In re Welfare of the Child of D.L.D.*, 771 N.W.2d 538, 545 (Minn. App. 2009) (noting that the district court considered a therapist's "favorable" testimony about a parent's parenting ability "in the context of previous findings regarding appellant-mother's mental-health issues and their impact on her children").

On this record, appellants did not rebut the statutory presumption. The district court properly determined that clear and convincing evidence shows that reasonable efforts had failed to correct the conditions leading to daughter and son's out-of-home placement.

### C. Poverty

Appellants allege that the district court should not have based its decision to terminate their parental rights on their poverty and homelessness. We have held that "[m]ere poverty . . . of the parents is seldom, if ever, a sufficient ground for depriving them of the natural right to the custody of their child or children, to say nothing of the statutory right." *In re Welfare of K.P.C.*, 366 N.W.2d 711, 714 (Minn. App. 1985) (quotation omitted).[10]

---

[10] Father argues that the district court erred when it determined that *K.P.C.* was no longer applicable case law due to the establishment of out-of-home placement timelines. Father

As discussed above, the district court found adequate reasons for termination independent of their poverty.[11] Appellants do not contend, and the record provides no support for the proposition that poverty caused appellants to refuse to clean up the hazardous and dirty conditions in their residences. Poverty does not explain appellants' failure to supervise their children, let them inside during cold weather, seek and provide appropriate medical care of their injuries and health conditions, and ensure their attendance at school and Kinder Kare once a bus pass was provided. There is no allegation that poverty caused father to continue using methamphetamine and not comply with required and paid-for chemical assessment and testing. In short, appellants have failed to make efforts towards reunification that were "within their ability, regardless of [their] poverty." *See In re Welfare of W.R.*, 379 N.W.2d 544, 549 (Minn. App. 1985) (affirming the district court's termination of appellant-father's parental rights because he failed to make "minimal efforts that were within his ability, regardless of his poverty"), *review denied* (Minn. Feb. 19, 1986).

## II. Best Interests

Appellants also dispute the district court's finding that termination of their parental rights was in the best interests of the children. In addition to determining

---

is correct, as we have cited to that case in an unpublished decision as recently as 2008, after the out-of-home placement timelines were established in 1999. *See In re Welfare of the Children of S.L.B.*, No. A07-1589, 2008 WL 570908, at *5 (Minn. App. Mar. 4, 2008); 1999 Advisory Comm. Cmt. to Minn. R. Juv. Prot. 42.01.

[11] Although homelessness was a primary factor in the termination of parental rights, there is no evidence in the record that appellants were evicted from the residence in June 2014 or the motel in January 2015 due to poverty rather than the damaged, hazardous, and filthy conditions in which they chose to maintain their residences.

whether one of the nine statutorily-defined bases for termination is present, a district court must also consider whether termination of parental rights is in the children's best interests and "explain its rationale in its findings and conclusions." *In re Tanghe*, 672 N.W.2d 623, 626 (Minn. App. 2003); Minn. Stat. § 260C.301, subd. 7 (2014) (stating that "the best interests of the child must be the paramount consideration" in proceeding to terminate parental rights).

The "best-interests" analysis requires the district court to balance the children's interest in preserving the parent-child relationship, appellants' interest in preserving the parent-child relationship, and any competing interests of the children. *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *Id.* "Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7.

Mother claims that termination was not in the best interests of the children because she has a close relationship with the children, is beginning to address her mental health concerns, and has exhibited no issues with chemical use during the case. Father alleges that termination was not in the best interests of the children because he is bonded to the children and there is no evidence that their lives will stabilize after termination. However, the district court made specific findings that balance the interests of appellants and children. While both appellants clearly love their children, testimony of a bond with the children is not enough to establish it is in the children's best interests for appellants to retain custody of the children, especially considering the amount of evidence to the

21

contrary. This evidence includes: the ongoing issues with lack of appropriate supervision; educational and medical neglect; a lack of safe, clean, stable, and permanent housing; father's frequent absences from the home; and mother's failure to adequately address her mental-health concerns. Substantial evidence shows that the children are in need of a stable, safe, and permanent home with proper guidance and supervision, which appellants have demonstrated they are unable to provide now or in the foreseeable future.

We understand appellants' arguments and the strong presentation by their attorneys. Parental-termination cases are about as close to irrevocability as anything judges have to deal with. But, with the substantial support in the record, we find the termination of parental rights was proper.

**Affirmed.**