**In the Matter of the WELFARE OF J.D.L., a/k/a J.D.E.**

**No. C3–94–715.**

Court of Appeals of Minnesota.

Oct. 4, 1994.

Allen P. Eskens, St. Peter, Karen J. Cody–Hopkins, Burnsville, for appellant.

Michael K. Riley, Nicollet County Atty., Todd W. Westphal, Assistant County Atty., St. Peter, for respondent.

Considered and decided by AMUNDSON, P.J., and DAVIES and HARTEN, JJ.

## OPINION

DAVIES, Judge.

Mother earlier terminated her parental rights. Father now challenges termination of his parental rights under Minn.Stat. § 260.221, subd. 1(b)(2), (3), (4), (8) (1992). We affirm.

## FACTS

In December 1989, appellant J.E., who was then 15 years old, and T.L., who was 16 years old, began dating. In February 1990, T.L. moved into a two-bedroom trailer shared by J.E. and J.E.'s mother, stepfather, brother, and two friends. J.E. frequently consumed alcohol in the trailer and used marijuana and LSD on at least one occasion. Shortly after T.L. moved in, J.E. dropped out of high school.

In March 1990, T.L. (mother) learned she was pregnant. J.E. (father) reacted to the news with anger—even smashing his car with a tire iron. They initially sought an abortion, but, believing they could not afford the $150 fee, decided to place the child for adoption.

On November 1, 1990, J.D.L. was born to the 17–year–old mother and 16–year–old father. Although the couple had already signed the adoption papers, mother rescinded them and sought to retrieve J.D.L. from his pre-adoptive home a month later. This angered father, who this time punched a hole in a wall. He also denied mother the use of his car to pick up J.D.L. In late December 1990, mother brought J.D.L. home to a three-bedroom apartment in Good Thunder, where the group then resided.

Initially father had little interaction with his new son, holding him for a "couple minutes" every two to three days. J.D.L. slept in his grandmother's room rather than mother and father's room, and mother and grandmother split the duties of caring for him. Father eventually learned to accept J.D.L. and occasionally play with him. But it appears that, in the four years since J.D.L.'s birth, the child has not been in his father's sole care for much longer than two hours at any one time.

In February 1992, in an effort to stem their ongoing fighting, father and mother moved with J.D.L. out of Good Thunder and into a trailer in Mankato. Shortly thereafter, two of mother's friends and one other child moved into the trailer. The group frequently held parties in the trailer while J.D.L. was present. Father and mother continued to fight. On at least one occasion the fight was over J.D.L.'s care. In this incident, the police were called to the trailer, which "terrified" J.D.L.

In March or April of 1992, father moved to Iowa—after another fight with mother. Mother took J.D.L. and moved with a new boyfriend to Klossner. Father only saw J.D.L. on three occasions between April and June of 1992.

In June 1992, mother abandoned J.D.L. in a road ditch in Nicollet County; she claimed he had been kidnapped. Two days later Nicollet County authorities found the child relatively unharmed, and placed him in foster care.

When J.D.L. first went to foster care he was very detached, holding himself rigidly and appearing standoffish. J.D.L.'s foster parents reported that he scavenged for food and would binge eat. He would stiffen when they attempted to cuddle him, and when he fell he did not respond to comforting, even if he hurt himself. He also suffered from "night terrors" and would wake up screaming. Soon, however, J.D.L. had fewer nightmares, became more accepting of affection, and stopped scavenging for and binging on food.

Nicollet County initiated a CHIPS action. No trial was ever held, however, because mother and the county reached an agreement for mother to admit to three of the CHIPS allegations. In March 1993, mother consented to termination of her parental rights and was sentenced to nine months in jail for falsely reporting J.D.L.'s kidnapping. Although father was not a party to the CHIPS petition (which was based primarily on mother's abandonment of J.D.L.), he appeared at the proceedings to seek visitation.

Nicollet County subsequently provided numerous services to father, including supervision of his visits with J.D.L., psychological and chemical dependency referrals, evaluations and recommendations, and referrals for domestic abuse and violence intervention programs.

In September 1993, Nicollet County petitioned to terminate father's parental rights. In January 1994, the district court dismissed the portion of the petition premised on the prior CHIPS action because father had not been a party to that action. After a bench trial, the court terminated father's parental rights. This appeal followed.

## ISSUES

I. Does substantial evidence support the trial court's order terminating father's parental rights pursuant to Minn.Stat. § 260.221, subd. 1(b)(2), (3), (4), and (8) (1992)?

II. Did the trial court err in dismissing the portion of the petition premised on the prior CHIPS action?

## ANALYSIS

 In a proceeding to terminate parental rights, the child's best interests are the paramount consideration. Minn.Stat. § 260.-221, subd. 4 (1992). "The petitioner need only provide sufficient evidence to support clear and specific findings of one of the statutory conditions." *In re Welfare of D.C.*, 415 N.W.2d 915, 917 (Minn.App.1987). Upon review, this court determines whether the trial court's findings address the statutory criteria, are supported by substantial evidence, and whether they are clearly erroneous. *In*

*re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn.1990).[1]

## I.

The trial court terminated father's parental rights, finding that: (1) he substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed by the parent-child relationship; (2) he continuously failed to contribute to the support of J.D.L. without good cause, despite being ordered, and able, to do so; (3) he was palpably unfit to be a father; and (4) J.D.L. was neglected and in foster care. Minn.Stat. § 260.221, subd. 1(b)(2), (3), (4), (8) (1992). Father challenges all four findings and we address them in order.

### A. Substantial, continuous, or repeated refusal to comply with the duties imposed by the parent-child relationship

■ Under Minn.Stat. § 260.221, subd. 1(b)(2) (1992), the state must prove that the parent substantially, continuously, or repeatedly refused or neglected to comply with his or her parental duties.[2] Notwithstanding father's relatively recent acceptance of J.D.L. as (at best) a once-a-week playmate, substantial evidence supports the trial court finding that father failed to meet his parental duties. Though as time passed (and J.D.L. grew from infant to preschooler), father may have viewed J.D.L. as less a burden and more a walking and talking "little buddy" (as he said), father's increasing acceptance of his son into his life, by itself, doesn't establish that he currently complies or ever did comply with the duties imposed as a parent.

Indeed, from J.D.L.'s birth until now, father apparently has not been the sole provider of J.D.L.'s care for longer than two hours at any given time. Instead, father has consistently avoided parental burdens. Before J.D.L.'s placement with a foster family, father left such duties to mother and grandmother. During J.D.L.'s foster care, the visitation notes indicate he repeatedly failed to show up, cancelled, or departed early; twice he went without visitation for long periods of time. During visits, father oftentimes ignored J.D.L. by talking on the phone or having J.D.L. watch videotapes, and when he did pay attention to J.D.L. he failed to recognize the child's developmental limitations, act as a proper role model, and anticipate potentially dangerous situations for J.D.L.

Father contends that he was not financially able to support J.D.L. Substantial evidence indicates, however, that father should have been able to contribute financially, as demonstrated by the money he spent on cars, alcohol, and girlfriends.

Father also contends that Nicollet County is responsible for his financial problems because it "withheld" appropriate assistance. We disagree. Substantial evidence supports the trial court's finding that Nicollet County "worked with [father] extensively prior to instituting the Petition for Termination of Parental Rights." The county: (1) provided foster care; (2) supervised and provided supplies for father's visits with J.D.L.; (3) provided both psychological and chemical dependency referrals, evaluations, and recommendations; and (4) referred father to domestic abuse and violence intervention programs, as well as parenting-skills training sessions. In addition, evidence supports the trial court finding that father's problems are due in part to his chronic unemployment and his lack of concern in maintaining a livelihood.[3] Accordingly, substantial evidence supports the trial court's termination of father's parental rights under Minn.Stat. § 260.221, subd. 1(b)(2).

### B. Continuous failure to contribute to the child's support despite being ordered to do so

■ Minn.Stat. § 260.221, subd. 1(b)(3) (1992), permits termination of parental rights

---

1. We note that at trial, the allegations of a juvenile protection petition must be proved by clear and convincing evidence. Minn.R.Juv.P. 59.05.

2. Father cites *In re L.L.N.*, 372 N.W.2d 60 (Minn. App.1985), for the proposition that Minn.Stat. § 260.221, subd. 1(b)(2), requires proof that the "inability to care properly for the child will continue indefinitely." We address this issue under C.

3. Although father has held between 10 and 20 jobs since J.D.L. was first placed in foster care, the longest lasted for only seven weeks, and father admits that he frequently quit jobs after becoming frustrated with his employers. Even when employed, father failed to contribute voluntarily to J.D.L.'s care.

if the parent continuously fails to comply with an order to provide financial support. As shown by our prior discussion of father's failure to provide financial support despite his ability to do so, substantial evidence supports the trial court's termination on this ground.

## C. Fitness to be a party to the parent-child relationship

Minn.Stat. § 260.221, subd. 1(b)(4) (1992), permits termination of parental rights if the parent is palpably unfit to be a party to the parent-child relationship. Father argues there are no "patterns of specific conduct" demonstrating he is palpably unfit to parent. We disagree. Indeed, we believe the pattern continued for far longer than should have been allowed. We note the supreme court's exhortation with respect to the termination of parental rights that "untoward delay of the demonstrated inevitable is intolerable." *In re Welfare of J.J.B.*, 390 N.W.2d 274, 280 (Minn.1986). We also note that the legislature has amended Minn.Stat. § 260.191 to require the timely disposition of placements. 1993 Minn.Laws ch. 291, § 21.

Substantial evidence supports the trial court's finding. First, visitation notes indicate a specific pattern of father's inadequate parenting skills. Nicollet County social worker Joy Sindelir, who supervised approximately 20 visits, noted: (1) an initial lack of affection and recognition between the two; (2) lack of verbal communication between the two; (3) father's failure to inquire if J.D.L. was okay after falls; (4) father's frequent cancellation of visits and early termination of others; (5) father's failure to change J.D.L.'s diapers, despite prompts to do so; (6) father's failure to provide snacks or supplies for the visits; (7) father's failure to recognize J.D.L.'s developmental limitations; and (8) father's failure to show concern regarding J.D.L.'s medical needs or condition.

Nicollet County social worker Lana Adams–Herr, who supervised approximately 40 of father's scheduled visits, also noted that he: (1) cut 16 visits short; (2) failed to notify her that he would not be there on six visits; (3) cancelled visitation nine times; (4) often failed to recognize J.D.L.'s need for a diaper change, or to change the diaper correctly; (5) failed to recognize harmful situations, such as J.D.L.'s tripping over auto parts in the driveway and playing in rabbit feces and urine located inside father's home; (6) frequently showed little emotion toward J.D.L.; and (7) ignored J.D.L. by engaging in long phone conversations during visitation or by placing J.D.L. in front of the T.V. to watch videos. Adams–Herr also noted father's lack of significant progress or improvement in his care of or interaction with J.D.L. from September 1992 to September 1993.

Second, psychological evaluations indicate that father lacks the motivation to parent. In November 1992, Dr. Susan Phipps–Yonas evaluated father and observed his interaction with J.D.L. She was concerned that father failed to initiate or take advantage of learning experience opportunities with J.D.L. She also noticed father's failure to act as a role model and his obliviousness to potentially dangerous situations. Dr. Phipps–Yonas concluded that father was exceptionally immature and had an extremely limited understanding of himself, and that he lacked appreciation of his dysfunctional past and his own mistakes and deficits. She testified that it is unlikely father will have the discipline and willingness to put aside his own needs and desires in order to care for a child in the foreseeable future, and that professional involvement was necessary. Dr. Phipps–Yonas recommended that father (1) participate in the Domestic Abuse Project for partner abuse training, (2) get a chemical dependency assessment, and (3) increase his vocational skills and get a GED.

Father was not accepted into the Domestic Abuse Project, however, because he denied having any domestic abuse problems. Father also failed to respond to Dr. Phipps–Yonas's letters arranging counseling and parenting training for him. Finally, although she arranged for father's participation in the Violence Intervention Project, he never completed the program due to his poor attendance and failure to pay.

Dr. George Komaridis, a licensed psychologist, evaluated father approximately 13

months after Dr. Phipps–Yonas had evaluated him. Dr. Komaridis found that father had matured since his psychological examination with Dr. Phipps–Yonas, but that he presently lacked proper parenting skills. Komaridis stated that J.D.L.'s grandmother would probably provide primary care if J.D.L. were returned to father, and speculated that father could possibly develop proper parenting skills within a "couple of years."

Father also contends that his past derelictions are remediable, and argues that the psychological and chemical dependency evaluations by Dr. Phipps–Yonas and Tony Lambrecht are inaccurate because they are superseded by more recent reports. But substantial evidence supports the trial court's finding that the passage of time had insufficient effect on father's parenting abilities, and that he still lacks and will continue to lack ability to fulfill his parental duties. First, Phipps–Yonas's report was not based solely on conditions that could be expected to improve as time passed. For instance, as Phipps–Yonas testified, father's MCMI–II profile suggests a significant psychopathology that represents a moderately severe mental disorder. Likewise, the trial court properly rejected the later chemical dependency evaluation by Albert Fack because it lacks credibility. Fack had concerns about father's truthfulness, and noted that father had admitted to four of the five warning signs indicating a chemical abuse problem.

Father finally contends that he might develop the appropriate parenting skills within a few years. Yet, as respondent points out, there is only a "chance" of a development, and the chance is speculative at best. We agree with the trial court that father's failure to make any recognizable changes in his parenting skills in the one and one-half years J.D.L. has been in foster care gives us little reason to believe sufficient changes will occur in the foreseeable future.[4] The prognosis of his future performance as a parent remains poor. Thus, substantial evidence supports the trial court's termination of father's pa-

rental rights under Minn.Stat. § 260.221, subd. 1(b)(4).

**D. Neglect of the child and placement in foster care**

Minn.Stat. § 260.221, subd. 1(b)(8) (1992), permits termination of parental rights if the child is neglected and placed in foster care. "Neglected and in foster care" means: (1) the child is in foster care by court order; (2) the parent's circumstances are such that the child cannot be returned to them; and (3) the parent, despite the availability of rehabilitative services, has failed to make reasonable efforts to change the circumstances, or has willfully failed to meet reasonable expectations in visiting or financially supporting the child. Minn.Stat. § 260.015, subd. 18 (1992). Father challenges the trial court's finding that the third element applies, arguing that the county provided "obligations," rather than helpful assistance. Specifically, he blames the county for failing to enroll him in the work readiness program.

We agree with the trial court that father's problem was not *obtaining* jobs, but rather *keeping* them. Indeed, father testified that he usually had at least one "line" on a job. Thus, father's claim is spurious since this program would have had little impact on his ability to maintain jobs—the work-readiness program generally prepares individuals only to go out and find work. Moreover, substantial evidence supports the trial court's finding that Nicollet County provided "extensive" support to father, and he nonetheless failed to make reasonable efforts to change his circumstances, and failed to meet reasonable expectations in visiting or financially supporting J.D.L. Hence, substantial evidence supports the trial court's termination of father's parental rights under Minn.Stat. § 260.221, subd. 1(b)(8).

**II.**

In light of our decision affirming the trial court on all four termination grounds, we need not address respondent's claim that the trial court erred in dismissing portions of the

---

4. Father admits his failure to comply with any of the county's recommendations, but testifies that he now has a "different attitude" and could

handle all of the various demands. But he offers no concrete plans about how this would be accomplished.

termination petition premised on the prior CHIPS action.

## DECISION

Substantial evidence supported the trial court's termination of parental rights under Minn.Stat. § 260.221 where the father could not make a fair promise of favorable care and treatment of his child.

**Affirmed.**

AMUNDSON, Judge (concurring specially).

Shaw was right wasn't he? Right to say "Parentage is a very important profession; but no test of fitness for it is ever imposed in the interest of the children."[1] In the present instance, appellant seeks to resist the termination of his parental rights to J.D.L. Nicollet County authorities, proceeding under Minn.Stat. § 260.221, subd. 1(b) (1992), have painstakingly followed legislative directives to reunite this "parent" and this child. The sad facts of this case may be summarized as follows.

Appellant began dating J.D.L.'s mother, T.L., in 1989 when he was fifteen years old. Soon after, the two were living together, and in November 1990, J.D.L. was born. Appellant was not present at J.D.L.'s birth; he went drinking instead. Appellant's relationship with T.L. became "rocky" and was marred by frequent fighting, including several physical altercations. Appellant often had parties at the family home and drank heavily when J.D.L. was present. Appellant had very little contact with J.D.L. and refused to participate in the child's care. After appellant and T.L. separated, appellant had little contact with J.D.L. and did not seek any visitation rights from the court.

J.D.L. was placed in foster care in June 1992 after being abandoned by his mother in a roadside ditch. At that time, J.D.L. was rigid, standoffish, and unable to relate to the most fundamental human relations. The physician who treated J.D.L. before his abandonment raised concerns about J.D.L.'s numerous ear infections. Although J.D.L. would be brought in, he was never re- checked. Prescribed medication was found unopened when J.D.L. went to foster care. J.D.L. had no "well-baby" checks and had missed two sets of immunizations.

Despite appellant's lack of care and concern for J.D.L., appellant petitioned the court for visitation and custody. County social workers supervising the visits noted a number of concerns including a lack of affection and recognition between appellant and J.D.L.; a lack of verbal communication; failure by appellant to respond or inquire when J.D.L. fell down; appellant's early termination of visits or cancelling visits due to work, leaving the state, and other unexplained reasons; appellant's failure to change J.D.L.'s diapers after prompts to do so; appellant's failure to provide snacks or supplies for supervised visits; appellant's failure to recognize J.D.L.'s developmental limitations; appellant's failure to show concern for J.D.L.'s medical conditions and needs; appellant's reliance on his mother to reschedule visitations; appellant's extended use of the telephone during visitations; and rabbit feces and urine in appellant's home.

Prior to a visit on May 4, 1993, appellant had no visitation with J.D.L. for a period of 33 days. Prior to a visit on September 15, 1993, appellant went approximately three weeks without visiting J.D.L. Despite the length of time between visits, appellant acted when he arrived for visitations as though nothing had happened and he showed little emotion upon resuming visitation. One social worker who supervised approximately 40 visits, observed no significant progress or improvement in appellant's care or interaction with J.D.L.

Nicollet County also provided appellant with various psychological examinations. These examinations and other corroborating information show that appellant is exceptionally immature, has an extremely limited understanding of himself and his circumstances, lacks appreciation for his dysfunctional past and his own mistakes, is unable to provide a safe and nurturing home for J.D.L., has repressed anger and frustration which may at times erupt, and is unable to be a responsible

1. George Bernard Shaw, *Everybody's Political What's What,* 1949, chapter 9.

adult and competent parent. Additionally, appellant has failed to complete high school or obtain a GED and has a sporadic work history.

Due to appellant's failure to sign and return forms, he has not participated in any parental training or child development educational programs. Appellant was dropped from a violence intervention program due to his sporadic attendance and failure to pay for the cost of the program. Appellant failed to follow through with a chemical dependency follow-up assessment. Additionally, appellant rarely attended case management meetings even though transportation was provided.

In sum, it is clear, and has been clear for some time, that appellant has consistently placed his wants and needs above the needs of J.D.L. and that he is incapable of sustaining a loving, stable and nurturing parental relationship with J.D.L. Despite appellant's obvious shortcomings as a parent, Nicollet County did not file a petition to terminate his parental rights until September 1993.

How has this tragic circumstance been permitted to persist for so many years? Perhaps a better question is why does the county need to "terminate" parental rights at all? According to Webster, to terminate something means "to bring an end to;" it would of necessity, therefore, require a beginning. Something which is lacking in this case. The child, J.D.L., has little more relation to this "parent" than the casual occurrence in which he was conceived. Totally unprepared for the consequences, two children engaged in a clandestine, nocturnal assignation and produced a third child, J.D.L. The mother sought to surrender the infant for adoption and later changed her mind.

For some inscrutable reason, the biological "father" resisted termination of his parental rights. For long months, years, the county tried, in vain, to intervene and assist the "father" in parenting. The evidence is clear that all the efforts were to no avail. Appellant never achieved a parental relationship with J.D.L.; but in a cavalier fashion could only treat his "son" as a curiosity. His attention to J.D.L., never steady, was frequently punctuated by long absences and bouts of chemical abuse.

When will we acknowledge that such ruinous conduct is antithetical to human rights? Do the rights of biological parents by virtue of their simple fecundity transcend the right of the newborn child to its life, its liberty, its health, and its happiness?

If we have no collective concern for these children as individuals, can we not as policymakers, legislators, judges and citizens be concerned about the effects such waste has on our own society? Can we afford to waste these lives, these children who might otherwise one day grow to be responsible, loving, and caring members of our community?

Couldn't one of these babies, given physical and emotional sustenance as children, some day discover a cure for cancer; another design new bridges and towers; still another compose the music that will stir us? Might not one of these children one day look through a telescope to discover and name galaxies we don't now know exist? Do we not owe it to ourselves as a people to insure that these unique creations achieve their potential?

Every human being, biological parent or not, who has ever held a newborn child knows that with every new child the world may begin again. We owe it to them and to ourselves to maximize their innate potential.

Are there really no new planets to be discovered?