*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1140**
**A23-1143**

In the Matter of the Welfare of the Children of:
S.L.G. and H.W.G., Parents.

**Filed April 8, 2024**
**Affirmed**
**Halbrooks, Judge***

Crow Wing County District Court
File No. 18-JV-21-2671

Anne Morris Carlson, Anne M. Carlson Law Office, PLLC, St. Paul, Minnesota (for appellant S.L.G.)

John P. Chitwood, Chitwood Law, PLLC St. Paul, Minnesota (for appellant H.W.G.)

Donald F. Ryan, Crow Wing County Attorney, Angela J. Frie, Assistant County Attorney, Brainerd, Minnesota (for respondent Crow Wing County Community Services)

Charles J. Frey, Frey Law, Ltd., Brainerd, Minnesota (for children J.H.G. and D.M.G.)

Tina Jay, Baxter, Minnesota (guardian ad litem)

Considered and decided by Cochran, Presiding Judge; Johnson, Judge; and Halbrooks, Judge.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**HALBROOKS**, Judge

Appellants, mother and father, challenge the termination of their parental rights, arguing that the record does not support the district court's determination that multiple statutory bases for termination were proved at trial and that the county made reasonable efforts to reunite the family. Appellants also argue that the district court's findings regarding the children's best interests are inadequate and lack record support. We affirm.

## FACTS

Appellants S.L.G. and H.W.G. have five minor children. S.L.G. is the mother of all five children.[1] She was not married when the children were conceived or born, and she is the sole custodian of the children. H.W.G. signed a Recognition of Parentage for each of the five children.

Over the course of their 12-year relationship, S.L.G. and H.W.G. have resided in six Minnesota counties: Hennepin, Itasca, Wright, Lyon, Crow Wing and Dakota. The services of child protection were involved in all counties with the exception of Dakota. A total of 31 child-protection intakes were generated by the various counties. Maltreatment was determined against both H.W.G. and S.L.G. on two occasions in two counties.

Over the years, the concerns of the various county services included: inadequate supervision of the children; inadequate provisions for the physical needs of the children; lack of housing stability; uninhabitable housing conditions due to the presence of rotting

---

[1] S.L.G. is also the mother of another child who is not part of this proceeding. That child resides primarily with his father in Wright County.

food, soiled diapers, mouse droppings, ants and cockroaches, and lack of food; allegations of physical abuse by H.W.G against S.L.G.'s son by another father and one of his own children; and allegations of domestic abuse by H.W.G. against S.L.G. In response, various case plans were developed for S.L.G. and H.W.G.

On September 30, 2020, respondent Crow Wing County Community Services (the county) received a child-protection intake report with concerns about neglect of the children and the cleanliness of the home. The home's condition was determined to be unacceptable for the children due to the amount of garbage and hazardous materials on the floor such as loose tobacco and medication, the presence of cockroaches in the home, unsanitary conditions in the bathrooms, including a backed-up sink and feces on the floor, and makeshift beds for the children. Law enforcement placed the children on a 72-hour protective hold.

After S.L.G. and H.W.G. cleaned the home, the children were returned on October 7, 2020. On December 1, law enforcement went back to the home on a welfare check. The county social workers noted that the home had deteriorated to a similar condition that it had been in to prompt the removal in September. As a result, law enforcement again removed the children from the home. Following an emergency protective-care hearing on December 4, 2020, the children were placed in the custody of the county for foster-care placement. S.L.G. and H.W.G. were each given a case plan with specific requirements, including maintaining a clean home, attending therapy appointments, completing parenting and psychological evaluations, and taking part in a visitation schedule with the children.

The county petitioned to terminate S.L.G.'s and H.W.G.'s parental rights on four statutory grounds under Minn. Stat. § 260C.301, subd. 1(b)(2), (4), (5), (8) (2022). The district court scheduled a trial for July 2022, but continued the trial based on various requests to allow S.L.G. and H.W.G. time to acquire housing that would be safe for the children and prepare for a trial home visit. S.L.G. and H.W.G. obtained housing in December 2022, with financial assistance from the county.

From December 2020 to the time of trial, the children remained in foster care but attended visits with S.L.G. and H.W.G. involving varying levels of supervision, ranging from supervised visits at county facilities to unsupervised weekend visits. Supervised visitation at the county facilities became the sole source of visitation in February 2023 after one of the children reported that she did not feel safe during the weekend visits with S.L.G. and H.W.G.

The trial began on March 27, 2023. Both S.L.G. and H.W.G. testified, along with several county workers. The district court received into evidence the family's past child-protective-services records beginning in 2011 across the five counties, mental-health records, case plans, risk assessments, case chronologies, supervised-visit notes, diagnostic assessments and evaluations, and photos of the homes. The district court also watched a recorded supervised visit that took place on February 14, 2023. After trial, the district court closely reviewed the record and issued extensive findings of fact, determining that the county had proved three of the four statutory bases for termination by clear and convincing evidence. The district court further found that the county's efforts to reunify the families were reasonable and that termination is in the best interests of the children.

This consolidated appeal follows.

## DECISION

## I.

Appellants argue that the district court clearly erred in finding that the county made reasonable efforts to reunite the family, abused its discretion in finding that the county had proved three statutory grounds for termination, and clearly erred in finding that termination of their parental rights is in the children's best interests.

Minnesota courts will terminate parental rights "only for grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990). The petitioner bears "the burden of producing clear and convincing evidence that . . . [a] statutory termination ground[ ] exists." *In re Welfare of C.K.*, 426 N.W.2d 842, 847 (Minn. 1988). A district court's decision in a termination proceeding must be based on evidence concerning the conditions that exist at the time of the termination. *In re Welfare of Child of T.D.*, 731 N.W.2d 548, 554 (Minn. App. 2007), *rev. denied* (Minn. July 17, 2007). Termination of a parent's rights is intended for those situations in which it appears "that the present conditions of neglect will continue for a prolonged, indeterminate period." *In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn. 1980).

Minnesota law sets forth multiple statutory grounds for termination of parental rights. *See* Minn. Stat. § 260C.301, subd. 1(b) (2022). In a termination appeal, an appellate court examines the record to determine whether the district court applied the appropriate statutory criteria. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 249 (Minn. App. 2003). In reviewing a termination order, we review the underlying findings of fact for clear error;

and we review a determination that a statutory ground for termination exists, as well as the district court's ultimate decision to terminate parental rights, for an abuse of discretion. *In re Welfare of Child of J.H.*, 968 N.W.2d 593, 600 (Minn. App. 2021), *rev. denied* (Minn. Dec. 6, 2021). We will affirm a termination order if at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the best interests of the child, so long as the county made reasonable efforts to reunite the family if such efforts were required. *In re Welfare of Child. of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005).

The district court here found that the county proved three of the four asserted statutory grounds for termination by clear and convincing evidence: (1) S.L.G. and H.W.G. had "substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon the parent by the parent and child relationship"; (2) "despite reasonable efforts made by [the county] and under direction of the [c]ourt, the [p]arents have failed to correct the conditions leading to the children's out of home placement"; and (3) "the children are neglected and in foster care." *See* Minn. Stat. § 260C.301, subd. 1(b)(2), (5), (8).[2]

---

[2] The district court found that the county did not prove that S.L.G. and H.W.G. were "palpably unfit" to parent. *See* Minn. Stat. § 260C.301, subd. 1(b)(4).

## II.

**Appellants challenge the district court's finding that the county made reasonable efforts to reunify them with their children.**

The district court must make "specific findings" in every termination proceeding that either "reasonable efforts to finalize the permanency plan to reunify the child and the parent were made including individualized and explicit findings regarding the nature and extent of efforts made by the social services agency to rehabilitate the parent and reunite the family" or "reasonable efforts for reunification [were] not required." Minn. Stat. § 260C.301, subd. 8 (2022).

In determining whether the county made reasonable efforts, the district court must consider whether the county offered services that were (1) selected in collaboration with the family; (2) tailored to the child's and family's needs; (3) "relevant to the safety, protection, and well-being of the child"; (4) "adequate to meet the individualized needs of the child and family"; (5) "culturally appropriate"; (6) "available and accessible"; (7) "consistent and timely"; and (8) "realistic under the circumstances." Minn. Stat. § 260.012(h) (2022). We review for clear error a district court's factual findings on the county's efforts provided to the family. *In re Welfare of Child. of J.C.L.*, 958 N.W.2d 653, 658 (Minn. App. 2021), *rev. denied* (Minn. May 12, 2021); *see also In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 87 (Minn. App. 2012) (stating that we review the district court's factual findings for clear error). We then review a district court's determination whether the efforts were reasonable for an abuse of discretion. *In re Welfare of Child of D.L.D.*, 865 N.W.2d 315, 322–23 (Minn. App. 2015), *rev. denied* (Minn. July 20, 2015).

7

This court will not reverse the district court's factual findings unless they are clearly erroneous. *In re Welfare of the Child of M.A.H.*, 839 N.W.2d 730, 740 (Minn. App. 2013). "A finding is clearly erroneous if it is manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *J.K.T.*, 814 N.W.2d at 87 (quotation omitted). The district court found that the county had provided over 30 different efforts to help the family reunite, and also included in its findings of fact a summary of the two prior contacts the county had with the family, in 2019 and in 2020 prior to the children's initial removal in September. These efforts included referrals for professional assistance in creating a household budget, classes on appropriate and trauma-informed parenting, individual and couples therapy, and parent-child therapy, to address the concerns preventing reunification noted in the parents' case plans. The district court's factual findings on the efforts by the county are supported by the record, through the testimony of the county's workers on the efforts they provided, and by the county's documentation submitted to the court of the various efforts. We conclude that the district court did not clearly err in its factual findings of the efforts provided to the family by the county.

H.W.G. argues that the county did not assist the family in finding housing. The county offered financial support to assist the parents in paying for a down payment and the first month's rent in October 2022. The county also had regular phone calls and meetings with the family to offer assistance in finding safe housing and paid for motels during weekend visits while the family continued to look for housing. The county offered to speak to landlords for the family, provided a letter of support to help in obtaining housing large enough for the family, and helped coordinate temporary housing for S.L.G. at a domestic-

8

violence shelter. Based on this record, the district court did not clearly err in finding that the county had provided efforts to help the family secure housing.

We next review the district court's determination that the county's efforts were reasonable. A district court abuses its discretion if its findings of fact are unsupported by the record, if it improperly applies the law, or if it resolves the question in a manner that is contrary to logic and the facts on record. *Woolsey v. Woolsey*, 975 N.W.2d 502, 506 (Minn. 2022). S.L.G. argues that the county's efforts were not reasonable because the county did not assist her in accessing information about her children's mental-health needs and the county's decision to collect child support put the family in a financial strain, hindering the family's attempts to find housing. For the reasons listed below, we disagree.

S.L.G. contends that the county did not assist the parents in becoming trauma informed about their children's mental-health needs and, therefore, the county's efforts were not reasonable toward reunification. Jenifer Budnick, the children's therapist, testified that the children have all been diagnosed with post-traumatic stress disorder (PTSD) and described different behaviors that the children display as a manifestation of their PTSD, including picking at fingernails to the point of excoriation, dissociation, hypervigilance, involuntary flashbacks, and angry outbursts with little to no provocation. The children required trauma-informed caregiving so as not to be triggered and also to allow the children to begin to heal.

The district court determined that the parents' argument lacked merit because the parents had several case-planning meetings about the children and could have asked about their mental health as part of their case plans. S.L.G. had the opportunity to attend trauma-

informed parenting education classes but failed to consistently attend. S.L.G. testified that she did not ask the county social worker for assistance in talking to the children's therapist about the children's mental-health needs. S.L.G. also testified that the Parenting Plus worker discussed the children's mental health with her. The parents had opportunities to be informed of the children's mental-health needs, as shown by the county's efforts in setting up case meetings with the parents and assisting S.L.G. in enrolling in parenting classes. The district court did not abuse its discretion in finding that the county's efforts towards reunification were reasonable.

S.L.G. contends that, because the county collected child support from H.W.G., its efforts towards reunification were not reasonable as it impacted the family's ability to find housing. The county collected approximately $1,000 from H.W.G.'s paycheck each month, beginning in May 2021 and continuing until S.L.G. and H.W.G. acquired adequate housing. At trial, both S.L.G. and H.W.G. testified that the collection of child support impacted the family's ability to find housing. The district court found the argument concerning child-support funds to be without merit as S.L.G. and H.W.G. had received money from COVID relief funds and tax returns which could have been used to secure housing if the amount of child support collected caused a financial strain. The child-support payments were awarded in default after H.W.G. failed to appear at the hearing. In addition, H.W.G. refused to provide the financial information that the county requested and never sought any modification of the child-support amount. The county also paid for a motel on weekend visits from August 2022 through September 2022 and provided over $2,000 in gas cards to the family to assist with financial difficulties. We conclude that the

district court's determination that the county made reasonable efforts to reunify the family is well supported by the record and was not an abuse of discretion.

## III.

**Minn. Stat. § 260C.301, subd. 1(b)(2)**

S.L.G. argues that the district court abused its discretion by finding that Minn. Stat. § 260C.301, subd. 1(b)(2), is a basis for termination because she had corrected the child-in-need-of-protection-or-services (CHIPS) petition concerns by the start of trial. A district court may terminate parental rights if

> the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental, or emotional health and development, if the parent is physically and financially able, and either reasonable efforts by [the county] have failed to correct the conditions that formed the basis of the petition or reasonable efforts would be futile and therefore unreasonable.

Minn. Stat. § 260C.301, subd. 1(b)(2). The district court must find at the time of termination that "the parent is not presently able and willing to assume" his or her parental responsibilities and that the parent's neglect of his or her "duties will continue for a prolonged, indeterminate period." *J.K.T.*, 814 N.W.2d at 90 (quotations omitted).

The district court found that S.L.G. and H.W.G. were not able and willing to assume their parental responsibilities at the time of termination due to its concerns about the parents' ability to maintain a clean home and because of the parents' demonstrated inability to address their own mental-health issues and those of the children. The parents deny the

11

severity of the home's condition at the time the children were removed. While the home was in an acceptable condition at the time of trial, based on the family's patterns, the district court expressed concern for the parents' ability to maintain the home's condition over time. *See In re Welfare of S.Z.*, 547 N.W.2d 886, 894 (Minn. 1996) (using a parent's prior history as context for existing circumstances); *see also In re Welfare of J.D.L.*, 522 N.W.2d 364, 368 (Minn. App. 1994) (observing demonstrated patterns of prior behavior during a termination proceeding). At trial, Glorina Fruetel, who was hired by the county to assist the family in maintaining the home and preparing for reunification, testified that if she did not give the parents assignments on how to keep the home in an appropriate condition, she believed the home would quickly fall back into an unfit state.

S.L.G. also argues that concerns about the children's mental health were not cited in the initial CHIPS petition and, to the extent those concerns were required to be corrected, that the county did not take reasonable efforts to assist her in addressing her children's mental health. If a parent resolves the factual bases that caused the children to be removed from the home, but a new factual basis is identified, the parent must still address the new factual basis before the condition can be considered corrected. *See In re Welfare of Child of D.L.D.*, 865 N.W.2d 315, 324 (Minn. App. 2015) (holding that within the context of a juvenile-protection case, a new factual basis for removal must be corrected), *rev. denied* (Minn. July 21, 2015).

In the family's case plans from as early as December 2020, the county identified mental-health needs as a safety concern preventing the children's return to the home. Both S.L.G. and H.W.G. were required by their case plans to participate in therapy. S.L.G. has

several mental-health diagnoses, including generalized anxiety disorder, major depressive disorder, and PTSD. She does not currently take prescribed medications to manage her mental health. H.W.G. denied any mental-health conditions, which conflicted with his diagnosis of acute adjustment disorder with anxiety. As the children began therapy, the county noted additional concerns about the children's mental-health needs as well as the parents' mental and emotional health. All of the children were diagnosed with PTSD and exhibited concerning behaviors as detailed above, requiring ongoing therapeutic support. The family's social worker, Wendy Johnson, testified that S.L.G. and H.W.G. did not understand the children's mental-health needs, giving an example that just a few days before trial, when discussing the children's diagnoses, the parents reacted negatively and claimed the children did not have any mental-health or developmental issues.

In addition to addressing their mental health, both parents' case plans required the parents to refrain from discussing the case with the children. "Failure to satisfy requirements of a court-ordered case plan provides evidence of a parent's noncompliance with the duties and responsibilities under section 260C.301, subdivision 1(b)(2)." *In re Welfare of Child. of K.S.F.*, 823 N.W.2d 656, 666 (Minn. App. 2012). The county staff had to intervene during supervised visits to stop the parents from discussing the case in violation of their case plans.

S.L.G. testified that she believed that the unsupervised visits with the children went well in part because the children could "talk about whatever they wanted to talk about," while H.W.G. testified that to ensure that his children felt safe, he would ask questions "to help us keep people away from us so we don't have any outside problems." The children's

therapist noted that both parents had told the children to lie to the county workers, and the children's guardian ad litem (GAL) testified that the parents had instructed the children not to speak to anyone. This behavior fails to satisfy the parents' case plans and further supports the district court's findings.

In addition to their individual case plans, the district court found that both S.L.G. and H.W.G. failed to meet their parental duties as detailed in the statute. As part of Minn. Stat. § 260C.301, subd. 1(b)(2), parental duties include, but are not limited to, "providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental, or emotional health and development." The children's current GAL, Tina Jay, testified that the children love their parents, but do not trust their parents to keep them safe, that they are afraid of their father when he yells and throws things, and that their parents are "gooder" at supervised visits than unsupervised ones.

In February 2023, the family abruptly switched from unsupervised weekend visits to fully supervised visits due to one of the children reporting that she did not feel safe with her father on visits. The child also reported that, on the weekend visits, the parents would feed the children first but that there would not be enough food left over for S.L.G. and H.W.G. The child's main concern, however, was that her father never be told what she reported for fear of his response. The district court's determination that the parents were not able to provide the children with appropriate care for their emotional, mental, and physical health is supported by the record. The district court did not abuse its discretion in finding this statutory basis was proved by clear and convincing evidence.

14

**IV.**

**Minn. Stat. § 260C.301, subd. 1(b)(5)**

S.L.G. and H.W.G. contend that the district court abused its discretion in finding that the statutory basis in Minn. Stat. § 260C.301, subd. 1(b)(5), was met because they corrected the conditions that initially led to removal and the county did not take reasonable efforts to reunite the family. Minn. Stat. § 260C.301, subd. 1(b)(5), permits termination upon a showing that

> (i) a child has resided out of the parental home under court order for a cumulative period of 12 months within the preceding 22 months. . . . ;
>
> (ii) the court has approved the out-of-home placement plan required under section 260C.212 and filed with the court under section 260C.178;
>
> (iii) conditions leading to the out-of-home placement have not been corrected. It is presumed that conditions leading to the child's out-of-home placement have not been corrected upon a showing that the parent or parents have not substantially complied with the court's orders and a reasonable case plan; and
>
> (iv) reasonable efforts have been made by the social services agency to rehabilitate the parent and reunite the family.

H.W.G. concedes parts (i) and (ii) of the statute. At the time of trial in March 2023, the children had resided out of their parents' home for more than two years. But S.L.G. and H.W.G. argue that parts (iii) and (iv) were not proved by clear and convincing evidence.

We conclude that the district court properly exercised its discretion when it found that the county had shown by clear and convincing evidence that the conditions leading to

15

the children being removed from the home had not been corrected. "It is presumed that conditions leading to [the] child[ren]'s out-of-home placement have not been corrected upon a showing that the parent or parents have not substantially complied with the court's orders and a reasonable case plan." Minn. Stat. § 260C.301, subd. 1(b)(5)(iii).

The CHIPS petition from September 2020 noted concerns of home cleanliness, neglect, and mental-health conditions. S.L.G. is not currently taking medication to manage her anxiety and PTSD against the recommendations of her psychiatric consultation. The district court found that H.W.G.'s denial of any mental-health concerns "demonstrates a complete lack of insight, accountability and truthfulness." The district court also found that, based on the testimony of Robert Bouley, the parents' therapist, the parents had not "actually addressed the underlying issues driving their mental health needs," which showed the parents had not "made substantial changes toward correcting the conditions which lead to the out of home placement." The children have demonstrated a need for additional therapeutic support for their PTSD and accompanying behaviors, both from mental-health professionals and from their caregivers at home. While the parents had corrected the housing-cleanliness concerns at the time of the termination trial, the district court found that the parents were likely to regress into old patterns, a finding that is supported by the testimony of Johnson and Fruetel. We reject S.L.G. and H.W.G.'s challenge to the district court's finding on Minn. Stat. § 260C.301, subd. 1(b)(5).

## V.

**Minn. Stat. § 260C.301, subd. 1(b)(8)**

S.L.G. and H.W.G. both argue that the district court abused its discretion by finding that the county had proved the parents' circumstances, condition, or conduct did not allow the children to be returned. Minn. Stat. § 260C.301, subd. 1(b)(8), provides a basis for termination if the district court finds "that the child is neglected and in foster care," which is defined in the statute as a child:

> (1) who has been placed in foster care by court order; and
>
> (2) whose parents' circumstances, condition, or conduct are such that the child cannot be returned to them; and
>
> (3) whose parents, despite the availability of needed rehabilitative services, have failed to make reasonable efforts to adjust their circumstances, condition or conduct, or have willfully failed to meet reasonable expectations with regard to visiting the child or providing financial support for the child.

Minn. Stat. § 260C.007, subd. 24 (2022).

The first element, that the children had been placed in foster care by district court order, is shown by the out-of-home placement plan. S.L.G. and H.W.G. argue that the district court abused its discretion in finding that the second and third elements were met because S.L.G. made reasonable efforts to change her circumstances and H.W.G. contributed financially to the children.

The second statutory element requires that the "parents' circumstances, condition, or conduct are such that the child cannot be returned to them." Minn. Stat. § 260C.007, subd. 24(2). The district court found that both S.L.G. and H.W.G. had not shown they

17

were able to care for their own mental health or their children's mental and emotional needs. In particular, the district court found that H.W.G. lacked insight on how to meet his children's needs or his family's financial needs. H.W.G. also denied that his children were afraid of him, which is directly contradicted by his child's report to the county. The district court found that S.L.G. was not able or prepared to meet the children's needs. The family's social worker testified that she did not believe H.W.G. or S.L.G. understood their children's mental-health needs based on their reaction to her explanation that one of the children is developmentally delayed.

S.L.G. argues that the district court's finding that she did not make reasonable efforts to change her circumstances is clearly erroneous. Specifically, S.L.G. asserts that she made substantial efforts to adjust her circumstances by obtaining housing without the county's assistance. S.L.G. did obtain housing after the county paid for the first month's rent and security deposit. The district court's finding is not clearly erroneous.

In addition to the above requirements, the district court is also required to consider seven factors when deciding if a child is neglected and in foster care, which are:

> (1) the length of time the child has been in foster care;
>
> (2) the effort the parent has made to adjust circumstances, conduct, or conditions that necessitates the removal of the child to make it in the child's best interest to be returned to the parent's home in the foreseeable future, including the use of rehabilitative services offered to the parent;
>
> (3) whether the parent has visited the child within the three months preceding the filing of the petition, unless extreme financial or physical hardship or treatment for mental disability or chemical dependency or other good cause

18

prevented the parent from visiting the child or it was not in the best interests of the child to be visited by the parent;

(4) the maintenance of regular contact or communication with the agency or person temporarily responsible for the child;

(5) the appropriateness and adequacy of services provided or offered to the parent to facilitate a reunion;

(6) whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time, whether the services have been offered to the parent, or, if services were not offered, the reasons they were not offered; and

(7) the nature of the efforts made by the responsible social services agency to rehabilitate and reunite the family and whether the efforts were reasonable.

Minn. Stat. § 260C.163, subd. 9 (2022). The district court found that the third and fourth factors weighed in favor of S.L.G. and H.W.G. because they had visited the children regularly and maintained communication with the county. But the district court found that the majority of the factors weighed against S.L.G. and H.W.G. The children had been in foster care for years at the time of the termination trial. S.L.G. and H.W.G. did not internalize the parenting skills offered through various services. The county detailed its services offered to S.L.G. and H.W.G., which the district court found were reasonable efforts.

Based on our review of the district court's analysis of both the statutory elements and the seven required factors, we conclude that the district court did not abuse its discretion in finding that the county proved this statutory basis by clear and convincing evidence.

# VI.

**Best Interests of the Children**

S.L.G. and H.W.G. assert that because the district court did not make express findings that termination is in the best interests of the children, the case should be remanded for additional findings.

If a statutory ground for termination of parental rights is proved, "the best interests of the child must be the paramount consideration." Minn. Stat. § 260C.301, subd. 7 (2022). Thus, a district court's order terminating parental rights must include a finding that termination is in the child's best interests. *In re Welfare of Child of D.L.D.*, 771 N.W.2d 538, 545 (Minn. App. 2009). "The 'best interests of the child' means all relevant factors to be considered and evaluated." Minn. Stat. § 260C.511(a) (2022).

A best-interests analysis requires consideration of three factors: "(1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 711 (Minn. App. 2004) (quotation omitted); *see* Minn. R. Juv. Prot. P. 58.04(c)(2)(ii) (requiring the district court to address these factors in a termination proceeding). Although the interests of the parent and child must be balanced, this "does not mean that the interests of the parent and the child are weighed equally." *In re Welfare of Udstuen*, 349 N.W.2d 300, 304 (Minn. App. 1984). The best interests of the child are the paramount concern. Minn. Stat. § 260C.301, subd. 7; *In re Child of P.T.*, 657 N.W.2d 577, 583 (Minn. App. 2003), *rev. denied* (Minn. Apr. 15, 2003).

We review the district court's determination that termination is in the children's best interests for an abuse of discretion. *J.H.*, 968 N.W.2d at 600. To be adequate, best-interest findings must facilitate effective appellate review, provide insight into which facts or opinions were most persuasive, and demonstrate comprehensive consideration of the statutory criteria. *See In re Welfare of M.M.*, 452 N.W.2d 236, 238-39 (Minn. 1990) (discussing the inadequacy of the district court's findings in the context of placement following a termination of parental rights). However, a district court's best-interests findings need not "go into great detail." *W.L.P.*, 678 N.W.2d at 711.

The district court stated that three of the five children wanted to return home under the belief that "somebody will be there to keep an eye on things."[3] The district court noted that the children had an interest in preserving the parent-child relationship as long as the parents would always be supervised, which was not consistent with the reality of returning the children to the home. The parents' interest in preserving their relationship with their children was noted by the district court. The district court found that the parents loved their children and wanted the children to return home as soon as possible.

But the district court also found that the children required "nurturing, consistent and stable parents" who are "trauma informed and aware of typical child development." And the district court found that S.L.G. and H.W.G. could not provide the environment needed to support the children based on their 12-year history of instability, the demonstrated level

---

[3] The other two children were too young to express their preferences.

21

of support needed to maintain a safe home environment, and their failure to address their mental-health needs.

Johnson and Jay both testified that terminating the parents' rights would be in the children's best interests based on the parents' lack of progress with their case plans. Johnson further explained that if the children were returned to the parents, she would have significant safety concerns due to the parents telling the children to lie to or not talk with service providers, allowing unknown or unsafe people to be around the children[4], the parents' inability to support their children's mental health needs both at home and in therapy, and the parents' failure to take responsibility for their own mental-health needs. Johnson also testified that, after consulting with Fruetel, Budnick, Jay, and other county teams involved with the family's case, all of the professionals involved with the case agreed that the parents were not ready to start a trial home visit, even as the group reviewed this assessment almost weekly up until trial. The district court expressly found that "the children's interest in a safe and stable home environment outweighs any harm that may come from the termination of their parents' rights" and that there is clear and convincing evidence that termination is in the children's best interests. Because the district court made the required findings and because S.L.G. and H.W.G. do not persuade us otherwise, we

---

[4] The parents had permitted a man to live with the family in September 2020. About two weeks before the children were removed, police arrested the man at the family's home on charges of criminal sexual conduct. Additionally, a week before trial, Tina Jay visited the parents and found two individuals who the parents had allowed to stay in the home. The parents either did not know or did not provide the individuals' last names when asked.

conclude that the district court did not err in deciding that termination was in the best interests of the children.

**Affirmed.**